**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BETTY BLACK,** *on behalf of herself and* | § | |
| *on behalf of all others similarly situated*, | § | |
| **Plaintiffs,** | § | |
| | § | **Cause No. 3:10-cv-1418** |
| **v.** | § | |
| | § | |
| **SETTLEPOU, P.C.,** | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

GILLESPIE, ROZEN & WATSKY, P.C.
3402 Oak Grove Ave., Suite 200
Dallas, Texas 75204
Tel:    214.720.2009
Fax:    214.720.2291

Joseph H. Gillespie
*Attorney-in-charge*
Texas Bar No. 24036636
josephgillespie@grwlawfirm.com
James D. Sanford
Texas Bar No. 24051289
jsanford@grwlawfirm.com

**ATTORNEYS FOR PLAINTIFF**
**BETTY BLACK**

## TABLE OF CONTENTS

SUMMARY OF BLACK'S OPPOSITION ................................................................................1

STATEMENT OF THE FACTS ...........................................................................................4

    1.    SettlePou, including Pou, Settle, and O'Dens, valued Black as an employee for the first five years of her employment ................................................4

    2.    SettlePou's Core Values: subjective and ambiguous ................................................5

    3.    SettlePou's Core Values do not include FLSA compliance ....................................5

    4.    SettlePou reclassifies Black as "exempt" without changing her title, job duties, compensation, or any other element of her employment, and Black's supervisor and Human Resources confirm that "promotion" is meant to avoid paying overtime ................................................7

    5.    SettlePou's Human Resources fails for three years to act on Black's repeated misclassification complaints ................................................8

    6.    Williams, O'Dens, and the Personnel Committee—prompted by Black's complaints—examine Black's classification in successive meetings in early 2010 before taking the issue to the Management Committee ................................................10

    7.    Williams responds to Black's persistent complaints by instigating Black's termination ................................................12

    8.    O'Dens recommends Black's termination only a month after the Personnel Committee and he last addressed Black's misclassification complaint ................................................13

    9.    SettlePou responds to Black's "ultimatum" with its own ultimatum: resign and release your FLSA rights, or be fired ................................................14

    10.    SettlePou  does nothing to confirm if it properly classified Black even after she files suit ................................................15

    11.    Three days after verifying SettlePou's interrogatory answers, O'Dens shifts the firm's reason for firing Black ................................................16

ARGUMENTS AND AUTHORITIES ...........................................................................17

    1.    Summary judgment is improper where—viewing the evidence and taking inferences in Black's favor—material factual disputes remain ................................................17

    2.    Genuine issues of fact remain in dispute as to whether SettlePou terminated Black because of her misclassification complaints ................................................19

(a)    *Black's burden is to show—by direct or circumstantial evidence—that SettlePou fired her because of her protected activity* .........................19

(b)    *Black's evidence exceeds the low showing required at the prima facie stage, and SettlePou must come forward with a non-discriminatory reason* ...............................................................20

    (i)    *Do Black's repeated oral and written classification complaints constitute protected activity under the FLSA? Yes.* ..............................................................20

    (ii)    *May the jury infer causation from the fact that SettlePou fired Black within two months of her complaints prompting the Personnel Committee to examine her exemption status and within a week of her complaint to Settle and Pou? Yes.* ........24

    (iii)    *Even if decision-makers' claims of ignorance are believed, Williams's animus led to Black's termination and therefore causation exists* ............................................................26

(c)    *A jury must decide if SettlePou's shifting reason is credible or a pretext for retaliation* ....................................................................27

    (i)    *Has SettlePou's termination reasons stayed the same where sworn discovery responses still refer to "verbal ... ultimatums" that are now absent from its story? No.* ...................29

    (ii)    *A jury must determine whether termination of a productive employee with a clean discipline record issue subjective and vague Core Values—without investigation and in less than eight minutes—is credible* ........................................31

    (iii)    *Inconsistencies in SettlePou's evidence story raise larger credibility issues that a jury must address* ......................................35

    (iv)    *SettlePou's actions after deciding on termination contradict its claim that the April 13 e-mail was sufficient grounds for termination* ........................................................................36

    (v)    *The suspicious timing of Black's termination—within weeks of her overtime complaints—and admissions by SettlePou personnel of overtime avoidance is further evidence of pretext* ....................................................................37

3.    Genuine issues of fact remain in dispute as to whether SettlePou willfully misclassified Black under the FLSA......................................................................38

4.     Application of the fluctuating workweek is improper here, where the parties lacked a clear, mutual understanding and where SettlePou paid *no* overtime, and Black is entitled to judgment as a matter of law ............................ 44

(a)     *The FWW is unavailable where there was no "clear mutual understanding" and where SettlePou failed to pay any overtime, even at a half-time rate* .......................................................................... 46

(i)     *Was there a clear mutual understanding where SettlePou treated Black as ineligible for overtime and Black continuously objected to the lack of overtime? No.* ..................... 47

(ii)    *Can SettlePou show contemporaneous overtime payments at half-time where it classified Black as exempt and refused to pay her overtime? No.* ............................................................ 50

CONCLUSION .................................................................................................... 50

CERTIFICATE OF SERVICE .............................................................................. 51

## TABLE OF AUTHORITIES

*Amburgey v. Covhart Refractories Corp., Inc.*,
  936 F.2d 805 (5th Cir. 1991) .........................................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................17, 18

*Baker v. Am. Airlines, Inc.*,
  430 F.3d 750 (5th Cir. 2005) .......................................................................20

*Bauer v. Albermarle Corp.*,
  169 F.3d 962 (5th Cir. 1999) .......................................................................20

*Blackmon v. Brookshire Grocery Co.*,
  835 F.2d 1135 (5th Cir. 1988). ...............................................................46, 49

*BNSF v. White*,
  548 U.S. 53 (2006)......................................................................................21

*Brennan v. Mazey's Yamaha, Inc.*,
  513 F.2d 179 (8th Cir. 1975).......................................................................25

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*,
  482 F.3d 408 (5th Cir. 2007).......................................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).....................................................................................18

*Conne v. Speedee Cash of Miss.*,
  246 Fed. Appx. 849 (5th Cir. Jul. 23, 2007)..........................................46, 50

*Cowan v. Treetop Enterprises*,
  163 F. Supp. 2d 930 (M.D. Tenn. 2001) ......................................................50

*Desert Palace v. Costa*,
  539 U.S. 90 (2003).......................................................................................19

*Donovan v. Brown Equip. & Serv. Tools, Inc.*,
  666 F.2d 148 (5th Cir. 1982).......................................................................44

*Donihoo v. Dallas Airomotive, Inc.*,
  No. 3:97-cv-0109P, 1998 WL 47632 (N.D. Tex. Feb. 2, 1998) ........................48

*Garcia v. Allsup's Conven. Stores, Inc.*,
  167 F. Supp. 2d 1308 (D.N.M. 2001) ...........................................................49

*Gee v. Principi*,
   289 F.3d 342 (5th Cir. 2002) ........................................................................30

*Gibson v. Swiss Reinsurance Am. Copr.*,
   Civ. A. No. 99-cv-2929-G (N.D. Tex. May 7, 2001) ......................................20

*Goldberg v. Bama Manufacturing Corp.*,
   302 F.2d 152 (5th Cir. 1962) .........................................................................25

*Hagan v. Echostar Satellite, LLC*,
   529 F.3d 617 (5th Cir. 2008)..............................................................20, 21, 22

*Hall v. Smurfit-Stone Container Enter., Inc.*,
   2008 WL 3823252 [Civ. A. No. 3:07-cv-0501-G], (N.D. Tex. Aug. 14,
   2008) ..............................................................................................................18

*Hunter v. Sprint Corp.*,
   453 F. Supp. 2d 44 (D.D.C. 2006) ......................................................45, 47, 48

*In re: Tex. EZPawn Fair Labor Standards Act Litig.*,
   633 F. Supp. 2d 395 (W.D. Tex. 2008)............................................45, 46, 47, 49

*James v. Career System Develop. Corp.*,
   No. C-05-4125, 2008 WL 3891968 (N.D. Cal. Aug. 20 2008)........................32

*James v. Med. Control, Inc.*,
   29 F. Supp. 2d 749 (N.D. Tex. Nov. 10, 1998) ..........................................12, 28

*Johnson v. Advertiser Co.*,
   __ F. Supp. 2d __, 2011 WL 1131507 (M.D. Ala. 2011) ................................24

*Kanida v. Gulf Coast Med. Personnel LP*,
   363 F.3d 568 (5th Cir. 2004) .........................................................................27

*Kasten v. Saint-Gobain Perform. Plastics, Corp.*,
   ___ U.S. ___, 131 S.Ct. 1325 (2011)...............................................21, 23, 24

*Laxton v. Gap Inc.*,
   333 F.3d 572 (5th Cir. 2003) ...............................................27, 33, 35, 37. 38

*Leps v. Farmers Ins. Exchange*,
   No. 3:09-cv-0780-K, 2010 WL 2470995 (N.D. Tex. Jun. 15, 2010) .........20, 22, 23, 27, 28

*Lindsey v. Prive Corp.*,
   987 F.2d 324 (5th Cir. 1993) .........................................................................32

*Love v. Re/Max of America, Inc.*,
      738 F.2d 383 (10th Cir. 1984) ..........................................................................24

*Martin v. UT Southwestern Med. Ctr.*,
      No. 3:07-cv-1663, 2009 WL 77871 (N.D. Tex. Jan. 12, 2009) ..................................34, 35

*Maynor v. Dow Chem. Co.*,
      671 F. Supp. 2d 902 (S.D. Tex. 2009) ..........................................24, 25, 26, 27, 28

*McLaughlin v. Richland Shoe Co.*,
      486 U.S. 128 (1988) ..........................................................................38

*Monahan, et al. v. Emerald Perform. Materials, LLC*,
      705 F. Supp. 2d 1206 (W.D. Wa. 2010) ..............................................................50

*Monroe Firefighters Assoc. v. City of Monroe*,
      No. 06-cv-1092, 2009 WL 916272 (W.D. La. Mar. 31, 2009).....................................39

*NLRB v. Scrivener*,
      405 U.S. 117 (1972) ..........................................................................21

*Olivio v. Crawford Chevrolet, Inc.*,
      __ F. Supp. 2d __, 2011 WL 3204698 (D.N.M. 2011)....................................................24

*Overnight Motor Transport Co. v. Missel*,
      316 U.S. 572 (1942)..........................................................................45, 46

*Palasota v. Haggar Clothing Co.*,
      499 F.3d 474 (5th Cir. 2007) ..........................................................................37

*Patrick v. Ridge*,
      394 F.3d 311 (5th Cir. 2004) ..........................................................................20

*Perez v. Guardian Equity Mgmt., LLC, et al.*,
      No. H-10-0196, 2011 WL 2672431 (S.D. Tex. Jul. 7, 2011) ..........................................38

*Poller v. Columbia Broadcasting System, Inc.*,
      368 U.S. 464 (1962)..........................................................................18

*Rainey v. Am. Forest and Paper Ass'n, Inc.*,
      26 F. Supp. 2d 82 (D.D.C. 1998) ..........................................................................45

*Reeves v. Sanderson Plumbing Products, Inc.*,
      530 U.S. 133 (2000)..........................................................18, 20, 36, 38

*Russell v. McKinney Hosp. Venture*,
      235 F.3d 219 (5th Cir. 2000) ..........................................................................34, 46

*Russell v. Wells Fargo and Co., et al.*,
    672 F. Supp. 2d 1008 (N.D. Cal. 2009) ...................................................................45, 47

*Samson v. Apollo Resources, Inc.*,
    242 F.3d 629 (5th Cir. 2001) ...................................................................46, 50

*Sinai v. New England Tel. and Tel. Co.*,
    3 F.3d 471(1st Cir. 1993) .............................................................................30

*Sandstad v. CB Richard Ellis, Inc.*,
    309 F.3d 893 (5th Cir.2002) ......................................................................27

*Schmitz v. St. Regis Paper Co.*,
    811 F.2d 131 (2nd Cir. 1987) ....................................................................30

*Scott v. OTS Inc.*,
    No. 1:02-cv-1950-AJB, 2006 WL 870369 (N.D. Ga. 2006)............................................50

*Singer v. City of Waco, Tex.*,
    324 F.3d 813 (5th Cir. 2003) .....................................................................38

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)...................................................................................18

*Staub v. Proctor Hospital*,
    __ U.S. __, 131 S.Ct. 1186 (2011) .............................................................26

*Swanson v. Gen. Servs. Admin.*,
    110 F.3d 1180 (5th Cir. 1997) ...................................................................25

*Tenn. Coal, Iron & R. Co. v. Muscola Local No. 123*,
    321 U.S. 590 (1944)..................................................................................44

*Thompson v. N. Am. Stainless, LP*,
    ___ U.S. ___, 131 S.Ct. 863 (2011)...........................................................21

*Thornbrough v. Columbus & Greenville R. Co.*,
    760 F.2d 633 (5th Cir. 1985) .....................................................................18

*Tolentino, et al. v. C&J Spec-Rent Serv. Inc.*,
    C-09-326, 2010 WO 2735719 (S.D. Tex. Jul. 12, 2010) .................................48

*U.S. v. Mead Corp.*,
    533 U.S. 218 .............................................................................................45

*Valcho v. Dallas Co. Hospital Dist.*,
    658 F. Supp. 2d 802 (N.D. Tex. Aug. 14, 2009) ................................................................39

*Walling v. A.H. Belo Corp.*,
    316 U.S. 624 (1942)........................................................................................................45

*Waltman v. Int'l Paper Co.*,
    875 F.2d 468 (5th Cir. 1989) ..........................................................................................20

*Williams v. City of Tupelo*,
    414 Fed. Appx. 689 ........................................................................................................18

*Wilson v. Dallas County*,
    3:02-cv-1065, 2003 WL 23017738 (N.D. Tex. Dec. 17, 2003) .........................................25

## STATUTES

29 United States Code
    Section 201......................................................................................................................1
    Section 207(a)(1) ..........................................................................................................44
    Section 255(a) ..........................................................................................................19, 38

## RULES

29 Code of Federal Regulations
    Section 541.100.............................................................................................................40
    Section 541.102.............................................................................................................40
    Section 541.104.............................................................................................................41
    Section 541.105.............................................................................................................40
    Section 541.700.............................................................................................................40
    Section 541.701.............................................................................................................40
    Section 778.114(a) .........................................................................................45, 46, 48, 50
    Section 778.114(c) ...................................................................................................45, 50

Federal Rule of Civil Procedure
    RULE 56(a) ...................................................................................................................17

Federal Rule of Evidence
    Section 801(d)(2) ..........................................................................................................38

## OTHER AUTHORITIES

DOL Opinion Letters
    Nov. 10, 1994 DOL Op. Letter (FLSA), 1994 WL 1004882 ........................................ 6
    Apr. 13, 1995 DOL Op. Letter (FLSA), 1995 WL 1032484......................................... 6
    Feb. 19, 1998 DOL Op. Letter (FLSA), 1998 WL 852691........................................... 6
    Mar. 20, 1998 DOL Op. Letter (FLSA), 1998 WL 852667 ......................................... 6
    FLS 2005-54 (Jan. 7, 2005), 2005 WL 330608 ......................................................... 6
    FLSA 2005-54 (Dec. 16, 2005), 2005 WL 3638473.................................................... 6
    FLSA 2006-27 (Jul. 24, 2006), 2006 WL 2792441 .................................................... 6

TO THE HONORABLE ED KINKEADE:

The record contains multiple disputed issues of material fact concerning Plaintiff's FLSA retaliation claims and SettlePou's reckless disregard for the statute.  Conversely, the Court should grant summary judgment *against SettlePou* on whether the fluctuating workweek calculation is available.

## SUMMARY OF BLACK'S OPPOSITION

Black was a thorn in the side of SettlePou and its Director of Human Resources, Kim Williams, because she repeatedly complained of misclassification under the Fair Labor Standards Act and asked to be paid overtime.  Williams fielded Black's repeated complaints but did nothing for three years.  Then, in early 2010, Williams suddenly escalated the issue to shareholder David O'Dens and the firm's Personnel Committee, which left Black's status unchanged after a cursory review.  A month later Williams instigated, and O'Dens recommended, Black's termination for doing the very thing that SettlePou contends made Black an exempt executive employee: attempting to supervise a co-worker.  Thus, Williams and O'Dens plucked the thorn, and SettlePou continued deliberately misclassifying its paralegal staff.

Black brings claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, for unpaid overtime stemming from SettlePou's willful misclassification and failure to pay her overtime for more than three years.  She also asserts that SettlePou retaliated against her in violation of the FLSA by firing her in April 2010 for complaining of the misclassification and lack of overtime.  SettlePou denies that it misclassified Black or retaliated against her and now moves for summary judgment on Black's retaliation and willfulness claims.  In addition, SettlePou moves for summary judgment on the method of calculating Black's overtime losses based on a narrow exception to the standard 1.5 times premium called the fluctuating workweek ("FWW") method, which it first raised three days before the close of discovery in the deposition

of the firm's Human Resources director.

The Court should deny summary judgment on the retaliation and willfulness claims because numerous material fact issues remain in dispute.

First, Black's evidence surpasses the requirements of a *prima facie* case of retaliation. The summary judgment evidence shows that she repeatedly complained of misclassification to the firm's Human Resources department and to partners like Jay Settle and Robert Pou. Among the evidence of a causal connection to her complaints is that each decision-maker learned of her complaints within the month prior to termination. Indeed, Black complained directly to Settle and Pou just *one week* before they decided to terminate this productive, discipline-free employee.

Second, Black also submits substantial evidence that SettlePou's stated reason is unworthy of belief and a pretext for retaliation. Representatives of the firm, from Human Resources to partners, told Black she was ineligible for overtime because she supposedly supervised the Commercial Lending section's legal secretary. Never mind that this supervision alone would not exempt her from the FLSA, but Black's attempts to supervise the secretary, Michelle Shed, met resistance and insubordination and SettlePou management refused to act. On April 13, 2010, Black sent an e-mail to Human Resources director, Kim Williams, to impress on Williams the futility of her situation and the fact that Black did not supervise Shed. Black's e-mail recommended Shed's termination and then offered to discuss Black's departure if SettlePou chose not to act on this request. On summary judgment, SettlePou claims that it took Black's e-mail as an "ultimatum" and that the e-mail violated the firm's Core Values.

SettlePou's reason is incredible for several reasons, not least of which is that the reason evolved over time. In addition to shifting, SettlePou's reason raises fact issues and credibility concerns that only the jury may resolve. As but one example, a jury must determine whether SettlePou is to be believed when it fired a five-year employee with a clean service record within

a week of her latest overtime complaint to firm partners for an e-mail attempting the very thing that SettlePou contends made Black an exempt employee—that is, to supervise Shed.  This and other fact issues concerning SettlePou's termination reason make summary judgment improper.

Genuine issues also remain in dispute concerning Black's claim that SettlePou willfully misclassified her under the FLSA.  Williams and a firm partner, Black's supervisor Carl Morgan, confirmed that the firm treated her as exempt in order to avoid paying overtime, but Black continued to raise the issue for three years until her termination. The summary judgment evidence is that Black repeatedly put SettlePou on notice that she was misclassified but the firm did nothing.  Worse, a quick internet search would have revealed considerable written guidance, both from the U.S. Department of Labor and other sources, showing that Black and other paralegals were non-exempt employees.  Even when SettlePou's Personnel Committee examined Black's status in February and March 2010, the committee looked at only one element (*i.e.*, supervision) of one exemption (*i.e.*, executive), gave no consideration to whether Black's primary duty was management, and concluded incorrectly that Black supervised two employees. Tellingly, today SettlePou cannot identify two employees whom Black allegedly supervised concurrently.  In sum, ample evidence shows that SettlePou knew that it misclassified Black or that it acted recklessly in disregarding the FLSA's obligations.  Summary judgment is therefore improper.

Conversely, Black is entitled to summary judgment on SettlePou's untimely attempt to misapply the FWW calculation.  SettlePou points to no evidence of a "clear mutual understanding" that the FWW method applied to Black during her employment or that it contemporaneously paid overtime at one-half her regular rate.  SettlePou therefore cannot meet the legal requirements to benefit from the FWW calculation and to allow it to do so retroactively cuts against the remedial purposes and labor-protecting purposes of the FLSA.  Thus, the Court

should grant Black's summary-judgment motion on this point.

## STATEMENT OF THE FACTS[1]

SettlePou's factual recitation jumps from early 2007, in paragraph 4, to February 2010, in paragraph 5. (Def.'s Br. at 2-3) Events in those three years—including Black's repeated oral and written complaints about misclassification and unpaid overtime—are essential to an understanding of this dispute. Those facts, which SettlePou ignores, minimizes, or improperly views in its favor, make summary judgment improper. Black sets them out below.

**1.     SettlePou, including Pou, Settle, and O'Dens, valued Black as an employee for the first five years of her employment**

SettlePou is a law firm of approximately 30 attorneys handling transactional, litigation, and regulatory matters. (Black dec. ¶2/Pl.'s App. 71) Among the firm's practice areas are Commercial Lending, Commercial Litigation, Creditor's Rights, Insurance Defense, Real Estate Transactions, and Business Counseling services. (*Id.*)

SettlePou hired Black on October 18, 2005 and she continued there until her termination on April 13, 2010.[2] (Black dec. ¶3/Pl.'s App. 71) Black mainly supported attorneys in the Commercial Lending group. The individuals who later decided her termination—firm founders John D. "Jay" Settle and Robert Pou, and shareholder David O'Dens—viewed her as a positive, productive employee and were unaware of performance or disciplinary problems. (O'Dens 18:22-19:17/Def.'s App. 55; Pou 21:20-22:9 (Pou: "happy with Ms. Black's performance")/Def.'s App. 45; Settle 25:10-14/Def.'s App. 35) As late as early 2010, when he issued Black's 2009 written evaluation, Robert Pou considered Black a "valuable team mate (*sic*)." (Sanford dec. Tab S/Pl.'s App. 424)

---

[1] Citations to evidence in Defendant's summary-judgment appendix (Doc. 31) bear the "D. App." prefix. Citations to evidence in Plaintiff's appendices contain a "Pl.'s App." prefix.
[2] SettlePou contends that Black's termination occurred on April 27, 2010 although the evidence shows that SettlePou decided to terminate Black on April 13, 2010 and then hired her replacement by April 19, 2010. (O'Dens 46:17-15/Def.'s App. 57; Pl.'s App. 172)

### 2.      SettlePou's Core Values: subjective and ambiguous

SettlePou maintains a list of "Core Values" in a general statement of purpose at the front of 40 pages of specific policies covering everything from the employee dress code, to internet use, to the standard employee workweek (*i.e.,* 37.5 hours) and entitlement to overtime.  (Ex. 1/Pl.'s App. 30)  The Core Values include broad concepts like respect, taking initiative, being persistent, communicating, and following through that O'Dens agrees are subjective and open to differing interpretations.  (O'Dens 49:17-50:14/Pl.'s App. 357-58)  Black, as Robert Pou noted in her 2008 performance evaluation, consistently "appl[ied] the Core Values."  (Sanford dec. Tab S/Pl.'s App. 425)

Until April 2010, the firm's Core Values evidently did not prohibit employees from giving ultimatums.   (O'Dens 38:15-40:3/Pl.'s App. 351-53; Pou 23:11-22/Def.'s App. 45)  O'Dens had been with SettlePou for nearly 20 years before deciding on Black's termination and received multiple employee demands in that time.  (*Id.*)  Demands like "[i]f you don't pay more, I'm going to quit" were not grounds for discipline, much less immediate termination, and the firm's response was to address the employees' concerns through discussion.  (*Id.*)  O'Dens cannot recall terminating anyone for issuing a pay-related ultimatum.  (*Id.*)  Likewise, Pou has had employees ask that another employee be disciplined or terminated.  (Pou 23:11-22/Def.'s App. 45)  There is no evidence that any negative consequence befell these employees after their demands.  (*id.* 35:18-21/ Def.'s App. 48)

### 3.      SettlePou's Core Values do not include FLSA compliance

The firm's Core Values say nothing about respect for federal wage and hour laws, and SettlePou little to comply.  (Ex. 1/Pl.'s App. 10)  Founding partners Pou and Settle are aware of the FLSA's requirement on employers to pay overtime.  (Pl.'s App. 304-305; Pou 12:6-24/Def.'s App. 43)  Pou, however, has never sought to learn the FLSA or determine how it would apply to

SettlePou employees (Pou 12:20-23/Def.'s App. 43, 42:13-20/Pl.'s App. 239), and the firm does not offer training on the FLSA's rights and protections that the firm offers.  (Weber dec. ¶9/Pl.'s App. 316)  Indeed, Director of Administration David Turner cannot recall any employee training regarding FLSA topics that he or Director of Human Resources Kim Williams led.  (Turner 39:9-20/Pl.'s App. 398)

The firm claims to leave FLSA classification decisions to the Personnel Committee.  But the members of this committee have not kept current on the FLSA.  Williams, the firm's Director of Human Resources and a member of the Personnel Committee, undertook virtually no FLSA-related instruction in her time in the human resources field either before or since joining SettlePou.  (Williams 26:8-27:18, 29:24-30:3, 31:12-32:22/Pl.'s App. 404-05)  SettlePou's highest-ranking HR person, she has no personal knowledge of FLSA regulations and made no effort to look up the law during Black's employment.  (*id.* 139:1-12/Pl.'s App. 413)  O'Dens, by comparison, practiced Labor and Employment law some 20 years ago but did not refresh his understanding of regulations on FLSA exemptions when they were updated and amended in 2004.  (O'Dens 55:20-56:18/Pl.'s App. 215-16)  Even after Black filed suit, O'Dens did not review the FLSA regulations until July 2011, after Black filed suit, when he verified SettlePou's second supplemental interrogatory answers.  (*Id.*)

Even when Black highlighted FLSA compliance concerns (*see infra.* at 7-13), SettlePou did nothing to reexamine the classification of its paralegal staff.  The United States Department of Labor often fields requests for interpretation from employers, and in the five years of Black's employment, the agency examined paralegal classification under the FLSA at least twice.[3]  These opinion letters followed at least five other DOL opinion letters on paralegal classification

---

[3] *See* FLSA 2006-27 (Jul. 24, 2006), 2006 WL 2792441; FLSA 2005-54 (Dec. 16, 2005), 2005 WL 3638473.  Copies of these opinion letters are found at Pl.'s App. 80-88.

questions in the preceding 11 years.[4]  In each instance, the DOL concluded that the paralegals in question were not exempt employees and were entitled to overtime.  SettlePou neither accessed the opinion letters nor asked the DOL to render an opinion about the firm's pay practices. (Williams 55:3-8/Def.'s App. 70)

**4.      SettlePou reclassifies Black as "exempt" without changing her title, job duties, compensation, or any other element of her employment, and Black's supervisor and Human Resources confirm that "promotion" is meant to avoid paying overtime**

Initially a legal secretary, SettlePou made Black a paralegal in 2006 but continued to treat her as non-exempt and paid overtime.  (Black 40:8-14/Def.'s App. 40)  Without warning, in early February 2007, Kim Williams advised that Black was being "promoted" and would supervise the section's legal secretary.  (Black 41:1-23/Def.'s App. 84)  Williams added that SettlePou was changing Black's status to "exempt" and that she would no longer be eligible for overtime.  (*Id.*) Meanwhile, Williams said nothing about a fluctuating workweek or overtime payments at half-time.

The move entailed no change in Black's compensation, benefits, duties or authority, leaving Black to question the firm's rationale.  (Black 41:17-42:24/Def.'s App. 84; Pl.'s App. 63) Her concerns multiplied when it became clear that there was no change in her relationship to the section's legal secretary, Keetra McGee.  Shortly after the "promotion", upset at the change, Black went to her supervisor, Carl Morgan, an attorney and partner in the Commercial Lending group.  (Black 44:3-46:23/Def.'s App. 84-85; Pl.'s App. 63)  Black asked Morgan whether the "promotion" was "basically so that the firm d[id]n't have to pay [her] overtime."  (*Id.*)  Morgan confirmed that it was, answering "Yes."  (*Id.*)

Bothered by Morgan's answer, Black took the issue to Human Resources.  Black approached Williams to ask about the "promotion" and put the same question to her: was the

---

[4] Copies of these opinion letters are found at Pl.'s App. 78-79, 89-95.

"promotion" so that the firm did not have to pay her overtime.  (Pl.'s App. 64)  Williams looked off, shrugged her shoulders, and nodded affirmatively.  (*Id.*)

Black did not leave the issue alone.  She returned to Williams's office about a week later. This time Black protested that she did not want the "promotion" and asked the firm to take it back.  (Pl.'s App. 64)  Williams refused, saying that she could not take it back.  (*Id.*)  When Black objected saying "[w]ell, I don't think it's right," Williams mustered only a weak response: "Well, sorry. There is nothing I can do."  (*Id.*)  There is no evidence that Williams did anything afterward in response.

5.    **SettlePou's Human Resources fails for three years to act on Black's repeated misclassification complaints**

Her concerns over the so-called "promotion" and resulting loss of overtime grew as Black's workload increased.  In the second half of 2007, alone, she logged more than 75 overtime hours without pay, working nights and weekends and through lunch most days.  (Def.'s App. 26;  Black  124:23-125:20,  159:22/Pl.'s App. 333-34, 337)    The workload remained consistently heavy into 2008 (83 OT hours) and 2009 (50+ OT hours), and then spiked in early 2010 (113+ OT hours through April 13).  (*Id.*)

Under this strain, she decided to speak out.    Between the "promotion" and her termination in April 2010, Black repeatedly complained to the firm's Human Resources department, to her supervisor, and to other SettlePou attorneys about the failure to pay her overtime.  She raised the issue both in writing and in face-to-face discussions, but her inquiries either went unanswered or met with indifference.[5]  (Pl.'s App. 64; Black 97:21-99:19/Def.'s App. 94)  Williams, for her part was dismissive, appeared frustrated with Black raising the issue, and

---

[5] Black sent Williams at least four written requests before December 2009 to be changed back to "non-exempt" so that she would receive overtime.  SettlePou did not allow her to retrieve the contents of her desk or print copies of e-mail and therefore she no longer has these e-mails.  (Black dec. ¶5/Pl.'s App. 454) SettlePou's apparent failure to place a litigation hold on its electronic data or to suspend its normal document destruction procedures lost these e-mails.  (Williams 11:20-13:2/Pl.'s App. 406-07)

gave the impression that she wanted Black to leave it alone.  (*Id.*)  Still, guided by the firm's Core Values, Black was persistent and continued to take the initiative to obtain a change in her classification status.

Black addressed the issue a second time to both Human Resources and to her supervisor in 2007.  Prescilla Stidman took over as the firm's Human Resources Director when Williams left in March 2007.  (Williams 64:1-4/Pl.'s App. 409; Black 51:2-53:19/Pl.'s App. 324-26)  Black learned that Stidman had prior law-firm HR experience and thought that she might have an explanation for Black being treated as exempt.  (*Id.*)  When Black asked why, Stidman did not have an answer.  (*Id.*)  Instead, like Williams before, Stidman was dismissive and implied that nothing could be done.  (*Id.*)  Black responded that she "d[id]n't think that [SettlePou had her] classified correctly" and asked to be reclassified.  (*Id.*)  Even this plain reference to the FLSA's requirements did not induce Stidman to do anything about it.  SettlePou's Human Resources lead replied only that she "wasn't the one who decided that and it's not … something that she could do."  (*Id.*)

Like Human Resources, attorney Morgan was unmoved by Black's protests.  Black broached the subject with Morgan for a second time in 2007.  (Black 48:15-49:24/Pl.'s App. 322)  As with Stidman, Black stated plainly that she "didn't think it was right that [she] wasn't being paid overtime" and that she thought it "was wrong of the firm to give [her] the promotion so that they don't have to pay [her] overtime."  (*Id.*)  Morgan's response left the clear impression that he was not going to do anything about it, and there is no evidence that he did.  (*Id.*)

Williams's return to SettlePou in 2008 offered another opportunity to address Black's complaint.  Black prepared for the meeting by searching the internet to understand paralegals' eligibility for overtime and their exemption status.  (Pl.'s App. 64; Black 98:23-99:11/Def.'s App. 94)  A quick search revealed articles discussing the issue.  (*Id.*)

A meeting occurred in Williams's office soon after she returned. (Pl.'s App. 64; Black 98:23-99:19/Def.'s App. 94) Black began by stating that, "[t]he firm misclassified me. I should not be an 'exempt' employee. I looked it up. I don't supervise two or more people." Williams responded that Black fell under one of the FLSA exemptions. (*Id.*) Having just read about the FLSA on the internet, Black responded, "I think you're wrong." and urged Williams to do her own research. (*Id.*) There is no evidence that Williams acted on Black's request, and Williams admits that she made no effort to research the FLSA or its regulations. (Williams 139:1-12/Pl.'s App. 413)

**6.    Williams, O'Dens, and the Personnel Committee—prompted by Black's complaints—examine Black's classification in successive meetings in early 2010 before taking the issue to the Management Committee**

SettlePou continued to misclassify Black into 2008 and 2009, and Black continued to raise overtime issues with Williams and others. (Pl.'s App. 63-66) On December 30, 2009, Williams instructed Black to complete timesheets and use the in/out system. (Ex. 4/Pl.'s App. 142-43; Pl.'s App. 65) Black answered that she "[t]hought that since [she] did not get paid overtime that [she] did not have to punch in and out." (*Id.*) Williams responded a few minutes later that Black needed to keep a weekly timesheet and use the in/out system so that the firm could track days off for payroll. (*Id.*) Black then called Williams to confirm, and, among other things, Williams directed Black to enter block time into the system rather than actual hours worked. After the call, Black entered block time entries for the period from October 12 through December 30 as instructed but kept track of the actual time on her calendar. (*Id.*; Black 110:3-10/Pl.'s App. 332)

Williams and Human Resources were not the only avenue that Black pursued in late 2009 and early 2010. She presented her objections to shareholders Jay Settle and Don Gwin in the discussion over her 2009 performance review. (Black 73:9-77:1/Pl.'s App. 327-31) Settle and

Gwin used the performance discussion to ask Black her thoughts about the firm. (*Id.*) Given this chance, Black again raised the issue of her classification. She noted that SettlePou did not pay her overtime "because [she] supervise[d] Michelle," and tried to get across that she did not, in fact, supervise Shed, that Shed did not view Black as her supervisor, and that Black believed that she was misclassified. (*Id.*) Neither lawyer responded to the misclassification issue. (*Id.*)

SettlePou failed to act on Black's overtime inquiries for more than three years. By February 2010, however, Black's persistent overtime complaints were a thorn in Williams's side that no longer could be ignored. Williams brought the issue to the Personnel Committee. O'Dens, Williams, and other members of the Personnel Committee met on February 4, 2010 to discuss, among other items, employee timekeeping and Black's "status". (Sanford dec. Tab S/Pl.'s App. 426) SettlePou has not produced records detailing these discussions other than redacted meeting minutes and its witnesses claimed not to remember the meeting.[6] But from the context it is evident that the Personnel Committee evaluated Black's exemption status in February 2010 while discussing time-keeping and record-retention for non-exempt employees. (*Id.*) From there, the Personnel Committee apparently forwarded the issue to the Management Committee.[7] (*Id.*)

Six days later, on February 10, Black e-mailed Williams to repeat her misclassification complaints. (Ex. 3/Pl.'s App. 141) As in earlier written and verbal discussions, Black noted that SettlePou reclassified her because Michelle Shed supposedly reported to her. (*Id.*) She then asked to "be changed back to a non-exempt status[.]" (*Id.*)

The lack of response caused Black to follow up in a March 1, 2010 e-mail. (Ex. 5/Pl.'s

---

[6] SettlePou produced the February 4, 2010 meeting minutes on August 8, 2011. (Sanford dec. ¶7/Pl.'s App. 319) It filed the motion for partial summary judgment two hours later (Doc. 29). SettlePou offers explanation for failing to produce unquestionably relevant and responsive in a timely manner.

[7] Notably, Settle now denies that the Management Committee ever considered employee complaints about classification under the FLSA. (Settle 29:3-7/Def.'s App. 36)

App. 145)  After updating her time records, Black responded to Williams by asking if Williams had "[a]ny word on changing [her] status to non-exempt[.]"  (*Id.*)  Again, the firm failed to respond directly.

Black's February 10 e-mail prompted the Personnel Committee once again to examine Black's exemption status.  (Williams 50:7-19/Def.'s App. 69)  Williams, O'Dens, and other Committee members met on March 4, 2010, the next regular meeting after Black's e-mails.  (*Id.*) O'Dens testified that Williams showed him the February 10 e-mail and that the Committee considered whether Black supervised two employees.   (O'Dens 27:8-19/Pl.'s App. 346) Meanwhile, the Committee failed to review the DOL's implementing regulations, drill down into what Black was or was not doing to "supervise" other employees, or consider the other elements of the "executive exemption" (*e.g.*, primary duty, authority to hire/fire).  (O'Dens 29:5-20/Pl.'s App. 212; *see also* Williams 53:4-9/Def.'s App. 70)  Nonetheless, O'Dens, Williams, and the Personnel Committee decided to continue classifying Black as exempt despite clear evidence to the contrary.  (O'Dens 31:18-22/Pl.'s App. 348)

### 7.     Williams responds to Black's persistent complaints by instigating Black's termination

Throughout March, as she had all of 2010, Black worked long hours, regularly putting in ten-hour days.  (Sanford dec. Tab U/Pl.'s App. 440)  Meanwhile, she continued trying to supervise Shed, who was unresponsive and at times insubordinate.  (Black 67:21-69:20/Def.'s App. 88-89; Pl.'s App. 65-66; Ex. 6/Pl.'s App. 146)  Black felt that she was "beating [her] head against the wall" in her attempts to direct Shed's work.  (*Id.*)  Williams and others at SettlePou allowed the situation to deteriorate.

Williams's inaction while Black logged long hours and struggled to direct Shed's work convinced Black to escalate the issue once again beyond Human Resources.  In the first week of

April, Black addressed her concerns directly to Settle and Pou in a meeting in Settle's office.[8] (Black 62:7-14, 64:5-66:23/Def.'s App. 87-88)   In the discussion, as she had previously, Black objected to the fact that she was not getting overtime because she supposedly supervised Shed. (*Id.*)   She explained that Shed was insubordinate and that she had no authority to discipline or control Shed's insubordination.   (*Id.*)   Again, her protests fell on deaf ears.   Settle and Pou, rather than look into Black's overtime concerns, put the issue back on Black and urged her to "work things out" with Shed.   (*Id.*; *see also* Pl.'s App. 66)   Neither examined Black's classification or studied the FLSA's requirements.   (Pou 41:10-42:20/Pl.'s App. 238-39; Settle 19:14-17/Def.'s App. 33)

**8.     O'Dens recommends Black's termination only a month after the Personnel Committee and he last addressed Black's misclassification complaint**

Shed refused yet another of Black's directions just a week after the meeting with Settle and Pou.   This insubordination led Black once again to speak with Williams.   (Ex. 6/Pl.'s App. 146; Pl.'s App. 66)   Shed claimed that Williams had advised her that she did not report to Black, and Black went to Williams for confirmation.   (*Id.*)   When they met on April 12, Williams advised Black that she shared supervision with four attorneys, including Settle and Pou. (Williams 77:18-78:8/Def.'s App. 73)   Black then reiterated her complaint that the firm denied her overtime because she supposedly supervised Shed and repeated her request to be reclassified. (Ex. 6/Pl.'s App. 146; Pl.'s App. 66)

SettlePou allowed Black's situation—long hours without overtime or supervisory authority—to deteriorate to the breaking point by early April 2010.   After three-years-worth of indifferent or dismissive responses, greater attention needed to be drawn on the issue.   (Black 134:2-7, 134:25-135:12/Pl.'s App. 335-36)   The April 12 meeting impressed on Black that

---

[8] Pou does not that the meeting may have occurred.   (Pou 20:2-21:2/Def.'s App. 44-45)   Settle, for his part, denies it.   (Settle 16:16-17:3/Def.'s App. 32-33)

Williams was not inclined to act on her complaints.  So, Black decided to send an e-mail highlighting the reality of her situation: that she did not supervise Shed and did not have authority over her.  (Def.'s App. 20)  Early on April 13, Black noted "everything that ha[d] transpired," referenced her complaint from the day before, and wrote that, "as [Shed's] supervisor, [she] want[ed] her dismissed."  (*Id.*)  If SettlePou chose not to accept her recommendation, she offered "to discuss [her] departure" upon returning from a prescheduled vacation. (*Id.*)

Williams now claims shock at receiving Black's e-mail although she admits that Black's similar, verbal comments on April 12 were not grounds for termination.  (Williams 83:4-7/Def.'s App. 74)  Whatever her response, Williams—for so long the outlet for Black's overtime complaints—set Black's termination in motion that morning.  She walked a copy of Black's e-mail over to Jay Settle's office.  (Settle 20:18-22:21/Def.'s App. 33-34)  Settle read the e-mail, and supposedly without asking for any background information, went to Pou's office where they gathered together with O'Dens.  (*Id.*)  Just over five minutes later O'Dens recommended termination and Settle and Pou agreed.  (O'Dens 10:14-11:25/Def.'s App. 53)  No one felt the need to speak with Black or Williams, or to uncover any background information, before ending Black's five-plus years of strong performance.  (O'Dens 12:20-22/Def.'s App. 53; Pou 29:6-13/Def.'s App. 47; Settle 24:9-16/Def.'s App. 34)  However, O'Dens, Pou, and Settle were all aware of Black's recent classification objections and the FLSA's obligations.  (Pou 12:11-23/Def.'s App. 43; *see also* Pl.'s App. 303-304; Sanford dec. Tab T/Pl.'s App. 434-38)

### 9. SettlePou responds to Black's "ultimatum" with its own ultimatum: resign and release your FLSA rights, or be fired

O'Dens, who carries the firm's Core Values in his pocket, contends that Black's e-mail—which he claims to have viewed as an "ultimatum"—showed disrespect and a lack of humility.

(O'Dens 48:18-24/Def.'s App. 57)  According to SettlePou, Black violated several of the firm's

Core Values.  Still, the firm decided to offer severance conditioned on a release of claims.

(O'Dens 34:23-35:13/Pl.'s App. 34-35)

Williams, joined by Settle and Pou, met with Black on April 23 when she returned from

vacation.  (Black 138:21-24/Def.'s App. 96)  Although it now claims that the April 13 e-mail—

alone—was the basis for termination, Williams read aloud a prepared statement explaining that

sending "email communications as well as verbally [giving SettlePou] an ultimatum" violated

the Core Values.  (Sanford dec. Tab S/Pl.'s App. 420; Williams 102:5-11 (Williams: "I remember

stating exactly these words.")/Def.'s App. 77)  Williams then presented Black with the firm's

ultimatum: resign or be fired.  (Black 138:21-141:7/Def.'s App. 96-97)

Shocked, Black struggled for words.  Harkening back to her complaints, she offered that

"[t]his all could have been avoided if it would have been handled properly … a long time ago."

(Black 139:19-140:8/Pl.'s App. 96)  Black chose not to make a decision in the meeting; instead,

she said, "I can't give you an answer right now…. I will have to try to figure up to see if [the

severance] is sufficient to pay me for my back overtime."  (*Id.*)

**10.    SettlePou  does nothing to confirm if it properly classified Black even after she files suit**

SettlePou terminated Black on April 13, 2010.  The firm executed the termination on

April 27, 2010 after Black's boyfriend, acting as her attorney, wrote to Williams, with copy to

Pou and Jay Settle, noting that Black "continue[d] to believe that her termination [was] in

retaliation for her protected activity of repeatedly complaining of long-standing FLSA violations

by SettlePou."  (Sanford dec. Tab S/Pl.'s App. 421)  This lawsuit followed in July 2010.  (Doc. 1)

Even these references to past complaints and unequivocal assertion of statutory violations did not

prompt O'Dens, Williams or others to action.  (O'Dens 96:15-21/Def.'s App. 59)  They did

nothing before discovery to investigate Black's earlier complaints or confirm that the firm was properly classifying paralegals. (Williams 141:18-21/Pl.'s App. 414; Pou 42:13-20/Pl.'s App. 239)

**11.    Three days after verifying SettlePou's interrogatory answers, O'Dens shifts the firm's reason for firing Black**

SettlePou's summary judgment stance is that SettlePou terminated Black for, in its terminology, "the Ultimatum E-mail". (Def.'s Br. at 4 ¶ 10)  According to O'Dens, Pou, and Settle, Black's e-mail violated the subjective concepts "engaging others with humility," "communication," and "finding solutions." (O'Dens 48:18-24, 49:17-14/Pl.'s App. 356-57) O'Dens concedes that each of these concepts is subjective and that others could read the April 13 e-mail without finding it disrespectful or lacking in humility. (O'Dens 49:17-50:14 ("Anything is possible."/Pl.'s App. 357-58)  Nonetheless, SettlePou insists that the April 13 e-mail was not only sufficient grounds for immediate termination but that it was the sole reason for firing Black.

The record and SettlePou's own sworn discovery answers say differently. O'Dens verified Defendant's answers to Black's First Interrogatories on October 27, 2010. The sworn answer to the question asking why SettlePou terminated Black alleges "[s]pecifically" that Black "made verbal and written ultimatums with regard to terminating another employee." (Pl.'s App. 148, 155)  SettlePou gave the same answer two months later in a supplemental response, and again O'Dens verified the information. (Pl.'s App. 157, 169)  On July 15, 2011, three days before his deposition, O'Dens verified the statement that "Plaintiff made verbal and written ultimatums" for a third time.[9] (Pl.'s App. 171, 184)

Three days later, in his July 18, 2011 deposition, O'Dens shifted SettlePou's position yet

---

[9] While this statement remained unchanged, SettlePou amended its answer to Number 5 to come in line with the first element of the executive, administrative, and professional exemptions, as amended in 2004. *Compare* Pl.'s App. 173 *with* Pl.'s App. 159.  The reason was that O'Dens finally reviewed the current version of the DOL regulations. (O'Dens 55:10-57:20/Pl.'s App. 214-16)

again.  O'Dens testified that "[i]t was clear in [his] mind that [Black] violated the firm's core values by sending [the April 13] e-mail *and sending it in the fashion that she did....*"  (O'Dens 42:5-43:5/Pl.'s 354-55)(emphasis added)  To O'Dens, Black breached SettlePou's Core Values by supposedly failing to raise Shed's performance issues to Settle, Shed's direct supervisor.  (*Id.*) This additional reason was not part of SettlePou's sworn answer from three days earlier.  Settle, in his deposition a week later, concurred in the new reason.  (Settle 36:11-20/Def.'s App. 37)  Yet Settle, Pou, and Williams all agree that Black was free to discuss the matter with Williams. (Settle 38:3-12/Pl.'s App. 391; Pou 30:9-31:5/Def.'s App. 47; Williams 86:2-6/Def's App. 75) This was perfectly acceptable under the firm's Open Door policy.  (*Id.*)  O'Dens concedes that Black was "[c]ertainly" permitted to complain to Williams, the Human Resources Director. (O'Dens 67:10-17/Pl.'s App. 367)

## ARGUMENTS AND AUTHORITIES

1.    **Summary judgment is improper where—viewing the evidence and taking inferences in Black's favor—material factual disputes remain**

Summary judgment is appropriate only where the record contains no genuine issue as to any material fact so that the movant is entitled to judgment as a matter of law.[10]  A genuine issue of material fact exists "if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party."[11]

SettlePou bears the initial burden of showing its entitlement to judgment as a matter of law.[12]  It must show—through competent evidence—the absence of genuine material fact issues and that it is entitled to judgment as a matter of law.[13]  If SettlePou meets that burden, Black then

---

[10] FED. R. CIV. P. 56(a).

[11] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[12] *Williams v. City of Tupelo*, 414 Fed. Appx. 689, 693 (5th Cir. Mar. 1, 2011)(unpublished)(quoting *Celotex*, 477 U.S. at 323).

[13] *Hall v. Smurfit-Stone Container Enter., Inc.*, Civ. A. No. 3:07-cv-0501-G, 2008 WL 3823252, *2 (N.D. Tex. Aug. 14, 2008).

must point to record evidence demonstrating the existence of material factual disputes.[14]  As long as "reasonable minds could differ as to the import of the evidence," such that factual disputes remain, the motion for summary judgment must be denied.[15]

In *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court unanimously confirmed the standard that courts must follow in evaluating motions for summary judgment.[16] *Reeves* and earlier precedent instruct the Court to accept Black's evidence as true and draw all reasonable inferences in her favor.[17]

Meanwhile, the Court should avoid making credibility determinations in light of conflicting evidence or competing inferences.[18]  For "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are functions of the fact-finder at trial, not those of a judge in ruling as a matter of law.[19]  Courts therefore must tread cautiously on summary judgment in cases turning on complex issues of intent and motive, such as retaliation matters.[20]  In these cases, "the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."[21]  "[T]rial by affidavit is no substitute" for a jury trial because "it is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised."[22]

---

[14] *Id.*

[15] *Liberty Lobby*, 477 U.S. at 250.

[16] 530 U.S. 133 (2000).

[17] *Id*. at 150-151; *Liberty Lobby,* 477 U.S. at 255.

[18] *Liberty Lobby*, 477 U.S. at 255; *Williams*, No. 10-60679, slip op. at 7.

[19] *Reeves*, 530 U.S. at 150-151; *Williams*, No. 10-60679, slip op. at 7 (noting that courts are not permitted credibility determinations when conflicting evidence is presented).

[20] *Cf. Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962)(internal quotation omitted).

[21] *Id.*; *see also Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 640 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)(commenting that summary judgment is an improper tool in discrimination cases, which involve "nebulous questions of motivation and intent.").

[22] *Id.*

**2.    Genuine issues of fact remain in dispute as to whether SettlePou terminated Black because of her misclassification complaints**

**(a)    *Black's burden is to show—by direct or circumstantial evidence—that SettlePou fired her because of her protected activity***

The FLSA bars employers from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint … under or related to" the FLSA.[23]  SettlePou's motion fails if Black presents either direct or circumstantial evidence of retaliatory intent.[24]  Circumstantial evidence of SettlePou's retaliatory motives is more than sufficient.  As the Supreme Court recognizes, circumstantial evidence of discrimination (and retaliation) "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."[25]

SettlePou's reason—Black's April 13 e-mail was the sole cause of termination—is arguably direct evidence of retaliation when viewed in context.  The e-mail links directly to Black's prior complaints about the lack of overtime payment and supervisory authority, and should be viewed as one more in that series of protests.  If so, SettlePou admits that it fired Black for what a jury is entitled to view as an overtime complaint.  Summary judgment is therefore improper.

But, given the weight of other evidence, it is unnecessary to view this as a case of direct evidence.  Another method of showing retaliation is the *McDonnell Douglas* burden-shifting framework used to examine circumstantial evidence of discrimination.[26]  Although a Title VII case, courts have adapted and applied the *McDonnell Douglas* analysis in FLSA cases.[27]  Black deats summary judgment by showing a *prima facie* case of retaliation and demonstrating that

---

[23] 29 U.S.C. § 215(a)(3).

[24] *Desert Palace v. Costa*, 539 U.S. 90, 96 (2003).

[25]  *Desert Palace,* 539 U.S. at 100.

[26] *Hagan v. Echostar Satellite, LLC,* 529 F.3d 617, 624 (5th Cir. 2008).

[27] *Id.*; *Leps v. Farmers Ins. Exchange,* No. 3:09-cv-0780-K, 2010 WL 2470995, *3 (N.D. Tex. Jun. 15, 2010).

SettlePou's reason is a pretext.[28]

Black's burden at the first step is not onerous and only a "low showing" is required to shift the burden to SettlePou.[29]  Her burden is simply to highlight existing fact issues concerning the contested elements of the *prima facie* case.[30]  Once she makes this "low showing," an inference of retaliation arises that SettlePou must rebut to avoid liability.[31]

Next, SettlePou must offer a sufficiently clear legitimate reason for its actions.[32]  If SettlePou satisfies its burden based on credible evidence, Black must produce evidence that SettlePou's reason is either false or unworthy of believe—that it was a pretext for retaliation.[33]  This pretext showing, combined with Black's *prima facie* case, allows a jury to infer that retaliation occurred.[34]

**(b)**     ***Black's evidence exceeds the low showing required at the prima facie stage, and SettlePou must come forward with a non-discriminatory reason***

SettlePou challenges only the first and third elements of Black's *prima facie* case.  To show *prima facie* retaliation, Black must submit evidence that (1) she engaged in protected activity, (2) that SettlePou fired her, and (3) that a causal link connects the two.[35]  Black's evidence surpasses this minimal standard.

(i)     *Do Black's repeated oral and written classification complaints constitute protected activity under the FLSA?  Yes.*

Inviting error, SettlePou's 17-page brief urges dismissal of Black's retaliation claims

---

[28] *Hagan*, 529 F.3d at 624.
[29] *See Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005); *Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999); *see also Gibson v. Swiss Reinsurance Am. Copr.*, Civ. A. No. 99-cv-2929-G, slip op. at 9 (N.D. Tex. May 7, 2001)(Doc. No. 67)(noting that it "is relatively easy… for a plaintiff to establish a *prima facie* case," quoting *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 811 (5th Cir. 1991)).
[30] *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989).
[31] *Bauer*, 169 F.3d at 966.
[32] *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).
[33] *Leps*, 2010 WL 2470995 at *3.
[34] *Cf. Reeves*, 530 U.S. at 148.
[35] *Hagan*, 529 F.3d at 624.

without a mention of the United State Supreme Court's most recent guidance on retaliation.  The Supreme Court's repeated admonition that anti-retaliation provisions be interpreted broadly appears nowhere in SettlePou's submission.[36]   Instead, SettlePou views the FLSA's anti-retaliation provisions narrowly in arguing that Black's repeated "inquiries" were not protected activity.  (Def.'s Br. at 9-10)

Earlier this year the Supreme Court spoke to what is necessary for protected activity under the FLSA.  In *Kasten v. Saint-Gobain Perfomance Plastics, Corp.*, the employer claimed that informal complaints to a supervisor about the placement of time clocks were not protected and therefore could not support a retaliation claim.[37]   Noting the statute's purpose and its similarity to broad employee protections under the National Labor Relations Act, the Supreme Court concluded that the FLSA protects both formal and informal complaints of statutory violations.[38]   A complaint is protected if it is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."[39]

The Fifth Circuit was ahead of the Supreme Court in recognizing that informal complaints of wage and hour violations were protected conduct.[40]   In *Hagan v. Echostar Satellite, LLC*, the Fifth Circuit affirmed the determination that the manager's internal objections that field technicians might receive less overtime pay under a re-worked schedule were not

---

[36]   *Kasten v. Saint-Gobain Perform. Plastics, Corp.*, ___ U.S. ___, 131 S.Ct. 1325, 1334 (2011)(concluding that the enforcement needs of the FLSA "argue for an interpretation of the word 'complaint' that would provide 'broad rather than narrow protection to the employee'" (quoting *NLRB v. Scrivener*, 405 U.S. 117, 123 (1972)); *Thompson v. N. Am. Stainless, LP*, ___ U.S. ___, 131 S.Ct. 863, 868 (2011);  *BNSF v. White*, 548 U.S. 53, 66 (2006).

[37]   *Kasten*, 131 S.Ct. at 1330.

[38]   *Id.* at 1334-35.

[39]   *Id.*

[40]   *Hagan*, 529 F.3d at 626.

protected statements.[41]   In doing so, the court adopted the then-prevailing rule that informal, internal complaints constituted protected activity under the FLSA so long as the complaint involved some violation and that it was more than "'abstract grumblings' or vague expressions of discontent…."[42]   Fatal to the plaintiff in *Hagan* was his own lack of subjective belief that the schedule change was illegal, that he did not frame his objections in terms of potential illegality, and that the change was in fact legal.[43]

These flaws are not present here.  Black's repeated objections were more than "abstract grumblings"; they were protestations of a deliberate effort to deprive her of overtime.  Black believed in good faith that SettlePou continued to misclassify her, and she used technical terms (*i.e.*, "exempt" versus "non-exempt", "misclassified") that framed the issue as one involving statutory rights to overtime.  Moreover, Black asserted that the firm "misclassified" her—a statutory violation—before urging Williams to "look it up."  Put differently, her issues involved actual, unlawful misclassification over several years.  Her were a far cry from Robin Hagan's vague comments revealing his own view that a schedule change was not actually illegal.[44]

Similarly, Black's complaints are different in quantity and quality than those found insufficient in SettlePou's cited cases.  In *Leps v. Farmers Ins. Exchange*, for instance, this Court concluded that neither suggesting that company management leave the room during a meeting to allow employees to speak freely nor expressing concern about being shorted overtime were protected actions.[45]   Neither act involved potentially illegal conduct like employee misclassification, and indeed, Leps's employer *paid him* all of the overtime claimed.[46] And in *James v. MedicalControl, Inc.*, another case decided before *Kasten*, this Court granted summary

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Compare Hagan*, 529 U.S. at 626.
[45] *Leps v. Farmers Ins. Exchange*, No. 3:09-cv-0780-K, 2010 WL 2470995, *4 (N.D. Tex. Jun. 15, 2010).
[46] *Id.*

judgment where the plaintiff-employee could not show evidence of protected activity.[47]  There, the plaintiff never complained to anyone of FLSA violations and at most had one conversation regarding his exemption status.[48]  Here, by comparison, Black raised her classification and claim for overtime more than a dozen times between the "promotion" and her termination, and she addressed those complaints to an array of SettlePou officials, from the head of Human Resources to the firm's named partners.

Aside from citing inapposite cases predating *Kasten*, SettlePou's method is to dismiss Black's statements as requests to be paid more rather than the comments on illegality that they were.  (Def.'s Br. at 10)  O'Dens strained in his deposition to distinguish Black's February 10 e-mail as a "request" rather than a "complaint."  (O'Dens 105:1-107:17/Def.'s App. 62)  On the one hand, this raises both a credibility issue about whether a seasoned lawyer with employment-law experience would understand Black's statements as O'Dens claims and a fact issue about whether a reasonable person could read the e-mail in the same way.  Whether a store clerk says to a gunman "Please don't steal from me" or shouts "Stop thief!", the effect is the same.  The thief is obligated to stop.  A jury must decide if SettlePou's interpretation is reasonable, or even if it makes a difference.

Conversely, O'Dens and SettlePou improperly elevate the standard for workplace protected conduct under the FLSA.  For "[i]t is not necessary that [an employee's] complaint include a specific statement" that the employer's policy violated the FLSA.[49]  A jury is free to infer from these so-called "request[s]" to be reclassified that Black was asserting her FLSA rights.[50]

---

[47] *James v. Med. Control, Inc.*, 29 F. Supp. 2d 749, 754 (N.D. Tex. Nov. 10, 1998).

[48] *Id.* at 753.

[49] *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 925 (S.D. Tex. 2009); *see also Johnson v. Advertiser Co.*, __ F. Supp. 2d __, 2011 WL 1131507, *4 (M.D. Ala. 2011).

[50] *Olivio v. Crawford Chevrolet, Inc.*, __ F. Supp. 2d __, 2011 WL 3204698, *5 (D.N.M. 2011)(inferring

Ultimately, the question is whether Black's complaints would cause a "reasonable employer to understand [them], in light of both content and context, as an assertion of rights protected by the statute…."[51]  Here, a reasonable employer—especially an employer trained in the law—would take from Black's comments that the FLSA was in play and see at least a *risk of* misclassification.  Indeed, that is what occurred.  The Personnel Committee reacted to Black's complaints by addressing her status in the February 4 and March 4 meetings.  In short, Black put SettlePou on notice of the need to review her status for compliance and SettlePou, in fact, reviewed it (albeit in a cursory way).  SettlePou cannot now claim that Black's complaints were anything other than an assertion of rights under the FLSA.

Finally, SettlePou does not challenge other aspects of protected activity such as Black's subjective good faith or that she stepped outside of her job role, and indeed there can be no dispute on these points.

(ii)    *May a fact finder infer causation from the fact that SettlePou fired Black within two months of her email prompting David O'Dens and the Personnel Committee to examine her exemption status and within a week of her complaint to Settle and Pou?  Yes.*

SettlePou next contends that Black cannot show evidence of causation.  (Def.'s Br. at 10-11)  Its position rests on self-serving denials of discussions with Black about classification and overtime claims.  On summary judgment, the Court must accept Black's testimony about these conversations.   In that light, decision-makers' knowledge of Black's FLSA complaints is a material fact dispute that the jury must resolve.

Black must show some "causal link" between her complaints and the termination to meet

---

from complaints about waiting between assignments were complaints about *not being paid* to wait between assignments); *cf. Love v. Re/Max of America, Inc.*, 738 F.2d 383, 384, 387 (10th Cir. 1984)(affirming verdict of retaliation under the Equal Pay Act where employer fired employee two hours after she submitted a memo requesting a raise and attaching a copy of the statute).

[51] *Kasten*, 131 S.Ct. at 1335.

her *prima facie* burden.[52]   She need not establish but-for causation at this stage, and evidence of temporal proximity between protected activity and the termination suffices.[53]   While there is no fixed boundary when timing is no longer relevant to show retaliation, it is clear that the two-month time period here falls within the range that the Fifth Circuit has accepted.[54]

Here, there is both evidence of direct causation and temporal proximity.   First, SettlePou's sworn interrogatory answers state that Black "made verbal and written ultimatums" that violated the firm's Core Value's.   (Ex. 9/Pl.'s App. 171)   Black testified that she raised her classification and overtime with Williams when they met on April 12 to discuss Shed.   (Pl.'s App. 66; Black dec. ¶2/Pl.'s App. 453)   Williams cannot recall exactly what was said that day.   (Williams 77:7-25/Def.'s App. 73)   Assuming that Black's version is true, then the "verbal ultimatum[]" for which SettlePou terminated her was a complaint under the FLSA.   This is direct causation.[55]

This direct connection aside, temporal proximity ties Black's termination to her complaints.   Each decision-maker learned of Black's misclassification complaint just weeks before her termination.   O'Dens admits that Black's February 10 e-mail prompted the Personnel Committee to review her exemption status in early March.   (O'Dens 21:9-25/Def.'s App. 56)   He recommended Black's termination a month later.   Likewise, Black complained directly to Settle and Pou *only a week* before the April 13 e-mail.   (Black 62:7-14, 64:5-66:23/Def.'s App. 87-88)   Yet SettlePou now claims that "Settle, Pou and O'Dens were completely unaware" of her

---

[52] *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 925-926 (S.D. Tex. 2009).

[53] *Id.* at 925 (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).

[54] *Id.* at 925-26 (summarizing cases).

[55]   *See Wilson v. Dallas County*, 3:02-cv-1065, 2003 WL 23017738, **8-9 (N.D. Tex. Dec. 17, 2003)(finding that demotion for expressing fears of working with a biased co-worker raised a fact issue where the sheriff was aware of the employee's prior complaints of discrimination and retaliation by the co-worker); *see also Brennan v. Mazey's Yamaha, Inc.*, 513 F.2d 179, 181-183 (8th Cir. 1975)(citing *Goldberg v. Bama Manufacturing Corp.*, 302 F.2d 152 (5th Cir. 1962), and concluding that employee's emotional outburst that played a role in termination was an assertion of rights under the FLSA).

protected activity.  (Def.'s Br. at 10)  Self-serving denials of the substance of Black's statements cannot overcome the standard way in which the Court must view this evidence.  Viewed in Black's favor, O'Dens, Settle, and Pou all learned of Black's complaints only weeks before deciding to fire her.  This tight temporal proximity creates a fact issue about causation and satisfies Black's *prima facie* burden.[56]

(iii)    *Even if decision-makers' claims of ignorance are believed, Williams's animus led to Black's termination and therefore causation exists*

SettlePou's attempt to insulate O'Dens, Pou, and Settle from Williams's awareness of and hostility to Black's complaints suggests another causal link.  Although careful to note that Williams supposedly gave no input into the termination decision, the decision-makers admit that Williams's delivery of the April 13 e-mail was the "catalyst" for the termination.  (O'Dens 103:5-11/Def.'s App. 61; Pou 62:8-11/Def.'s App. 50; Settle 32:17-22/Def.'s App. 36; *see also* Williams 141:22-142:2/Pl.'s App. 414)  SettlePou would not have terminated Black had Williams not handed the April 13 e-mail to Settle.  (Pou 62:8-11/Def.'s App. 50)

An employer like SettlePou may be liable even if the decision-maker is without discriminatory (or retaliatory) animus.  SettlePou is liable if Williams, intending to retaliate against Black, commits an act that is the proximate cause of Black's termination.[57]

The summary judgment evidence is that each decision-maker knew of Black's misclassification complaints and that a causal link tied those complaints to the termination.  (*See supra.* at 11-13)  Even if that were not the case, causation exists because Williams was the Cat's paw.  SettlePou appears not to contest that Black complained to Williams; instead, it minimizes the complaints as "sporadic conversations with Ms. Williams about her exemption status …." (Def.'s Br. at 11)  Moreover, Williams reflected her animus through dismissive responses and

---

[56] *Maynor*, 671 F. Supp. 2d at 926 (six week period between complaint and termination supported an inference that there was a causal link between the two events).
[57] *Staub v. Proctor Hospital*, __ U.S. __, 131 S.Ct. 1186, 1194 (2011).

expressions of frustration.  (Pl.'s App. 64; Pl.'s App. 454)  She gave the impression that she just wanted Black to leave the matter alone.  (*Id.*)  When Black persisted, the April 12 meeting with Black and the April 13 e-mail gave Williams a chance to remove the thorn from her side.  She instigated Black's termination by presenting the e-mail to Settle and then maximized its impact by withholding necessary context.  This was the proximate cause of Black's termination.

**(c)**      ***A jury must decide if SettlePou's shifting reason is credible or a pretext for retaliation***

A presumption of retaliation arises from Black's *prima facie* case that SettlePou must rebut to avoid liability.[58]  Assuming there is credible evidence of a legitimate reason, Black can defeat summary judgment by offering evidence that the reason is a pretext for retaliation—that is, by raising a fact issue as to whether SettlePou discharged her "because of" her FLSA complaints.[59]  Evidence showing an employer's reason to be false or unworthy of belief, "taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination even without further evidence of [the employer's] true motive."[60]  No further evidence of retaliatory animus is needed because "once the employer's justification has been eliminated, [retaliation] may well be the most likely alternative explanation…."[61]  Courts in this circuit use the same analysis as in retaliation cases under Title VII when assessing FLSA retaliation claims and often look to Title VII cases for guidance.[62]

SettlePou's current explanation is that O'Dens, Pou, and Settle decided to terminate Black because the April 13 e-mail "violated the Firm's Core Values."  (Def.'s Br. at 4 ¶10)  This reason, if not direct evidence of retaliation (*see supra* at 19), is incredible for at least five

---

[58] *Leps*, 2010 WL 2470995 at *3.
[59] *Maynor*, 671 F. Supp. 2d at 922 (citing *Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 576 (5th Cir. 2004)).
[60] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)(quoting *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 899 (5th Cir.2002)).
[61] *Reeves*, 530 U.S. at 147-48.
[62] *E.g.*, *Leps*, 2010 WL 2470995 at *3; *James*, 29 F. Supp. 2d at 752; *Maynor*, 671 F. Supp. 2d at 922.

reasons.

First, SettlePou's summary-judgment reason conflicts with the reasons that it repeatedly gave in discovery.  That this shift conveniently allows SettlePou to deny a causal link between the termination and Black's misclassification complaints raises a material fact issue for the jury to decide.

Second, the jury must determine whether SettlePou's reason for Black's termination is at all credible.  It is a fact question whether a reasonable person would terminate a five-year employee with a clean service record in *less-than eight minutes*, with *no investigation*, and *without speaking* to the employee.  Further, whether a reasonable person would view Black's statements as an ultimatum rather than the protests about overtime and misclassification that she intended them to be is an open question.

Third, SettlePou's various and varying positions in this case contain multiple inconsistencies that cast doubt on the credibility of its other evidence and its witnesses' testimony.  Resolving these credibility determinations is improper on summary judgment.

Fourth, SettlePou's conduct after the termination is further pretext evidence.  Claiming that an ultimatum violates its Core Values, SettlePou nonetheless offered Black severance (tied to a waiver of rights) and then *issued an ultimatum*.  These are not the actions of an employer earnestly enforcing professed values.

Fifth, the suspicious timing of Black's termination is another fact question for the jury. SettlePou fired Black only one month after O'Dens and the Personnel Committee last considered her "request" to be reclassified and only *one week* after her direct complaint to Settle and Pou. While temporal proximity alone will not establish pretext, the close timing cannot be ignored here in the context of SettlePou's changed reasons and the credibility issues arising out of its evidence.

These reasons combine with the narrow temporal proximity and the remainder of Black's *prima facie* case to raise triable fact issues that prevent summary judgment.

(i)     *Has SettlePou's termination reasons stayed the same where sworn discovery responses still refer to "verbal … ultimatums" that are now absent from its story?  No.*

A jury must examine the various and varying explanations that SettlePou offers for Black's sudden and admittedly unanticipated termination.   (Settle 25:10-14/Def.'s App. 35)  SettlePou now insists that "Settle, Pou and O'Dens made the decision to terminate [Black] on April 13, 2010 solely because [Black] gave SettlePou *this* ultimatum demanding the firm choose between two employees."  (Def.'s Br. at 11 (emphasis added))  This assertion must be judged against its previous statements in this case.

In discovery, Black submitted a focused interrogatory asking for the "reason(s) why [SettlePou] terminated Black's employment."   On October 27, 2010, David O'Dens verified SettlePou's answer:

> Defendant terminated [Black's] employment because Plaintiff failed and refused to comply with Defendant's core values, as required of all its employees. ***Specifically***, [Black] made ***verbal and written ultimatums*** with regard to terminating another employee.  This type of behavior is unacceptable and is not aligned with Defendant's core values.

(Pl.'s App. 148 (emphasis added))

The response echoed the prepared statement that Williams read in the termination meeting.  (Sanford dec. Tab S/Pl.'s App. 420; Williams 102:5-11 (Williams: "I remember stating exactly these words.")/Def.'s App. 77)  SettlePou repeated this answer in supplemental responses on December 3, 2010 (Pl.'s App. 157) and again on July 15, 2011 (Pl.'s App. 171), both verified by O'Dens.

The O'Dens deposition occurred three days after he verified SettlePou's latest supplemental interrogatory answers.   On July 18, 2011, O'Dens repeated the allegation that

Black "violated the firm's core values by sending [the April 13] e-mail," but then added that Black violated the firm's core values by "sending [the April 13 e-mail] in the fashion that she did."  (O'Dens 42:5-43:5/Pl.'s App. 354-55; *see also* O'Dens 14:8-17/Def.'s App. 54)   To O'Dens, Black supposedly circumvented the chain of command by going to Human Resources with her complaint.  (*Id.*)   However, Settle and Pou believe that there was something inappropriate about Black raising concerns with Human Resources.  (Settle 36:11-20/Def.'s App. 36; Pou 27:1-14/Pl.'s App. 46)

Variation in an employer's explanation for an employment decision is evidence of pretext.[63]  SettlePou's reasons first multiplied—"verbal and written ultimatums" to ultimatums plus inappropriate communication—before shrinking again on summary judgment.  The reason for this latest shift is evident.  Including "verbal ultimatums" connects Black's termination to her prior statements to Williams, namely her complaint that the firm denied her overtime because she supposedly supervised Shed and her request to be reclassified.  (Pl.'s App. 453)   Further, jettisoning the tacked-on inappropriate communication reason was necessary because it was false.   Both Williams and Settle acknowledge that firm policy permitted Black to raise complaints in the way she did. (Settle 38:10-12/Pl.'s App. 392; Williams 86:2-6/Def.'s App. 75; *see also* O'Dens 67:10-17 (Black could "[c]ertainly" make complaints to HR)/Pl.'s App. 367)   In any case, she *did* address her concerns to Settle, her supervisor.  (Black 64:5-22, 66:12-20/Def.'s App. 87-88)

SettlePou may respond that this shift is immaterial because both explanations involve a supposed ultimatum.  But what is relevant and telling about the changed reason is its connection

---

[63] *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 415 (5th Cir. 2007)(concluding that defendant's reason for failing to promote the African-American plaintiff was suspect because it had not remained the same); *Gee v. Principi*, 289 F.3d 342, 347-348 (5th Cir. 2002)(same); *accord Sinai v. New England Tel. and Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993); *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131 (2nd Cir. 1987).

to the remainder of SettlePou's argument: that decision-makers supposedly were unaware of Black's FLSA complaints.  (*See* Def.'s Br. at 10)  The decision-makers deny discussing the April 13 e-mail with Williams (other than to receive it) before deciding on termination.  How, then, did they learn of a "verbal ultimatum"?  The answer must be either that they were aware of Black's prior oral misclassification complaints or that Williams *in fact* informed O'Dens, Pou, and Settle of the April 12 discussion.  Confining the termination decision to the April 13 e-mail—in spite of its current, sworn interrogatory answer—is SettlePou's late attempt to insulate the termination decision from Black's FLSA complaints.

(ii)    *A jury must determine whether termination of a productive employee with a clean discipline record using subjective and vague Core Values—without investigation and in less than eight minutes—is credible*

SettlePou also argues that the April 13 e-mail "was clearly against SettlePou's Core Values…."  But what are those Core Values?  They reflect general concepts that O'Dens admits are subjective and open to multiple interpretations.  (O'Dens 48:18-50:14/Pl.'s App. 356-58)  He also admits that a respectful and humble reading of the April 13 is possible.  (*Id.*)  When is a SettlePou Core Value violated?  The only evident reason is a circular one: an employee violates the Core Values when the firm says so.  Notably, there was no discussion of which Core Value(s) Black may have violated before O'Dens, Settle, and Pou decided on termination in their five-to-eight-minute meeting.  (Pou 26:3-27:13/Def.'s App. 46; Settle 33:7-10/Def.'s App. 37)  Lacking any objectivity, a jury must decide if SettlePou's claim that Black's e-mail, in context, violated Core Values.

This circuit recognizes that subjective employment criteria like SettlePou's Core Values, though they may serve legitimate functions, also provide opportunities for unlawful

discrimination.[64]  Here, the Core Values explanation is so broad, vague, and subjective that it is an opportunity for unlawful retaliation.[65]  For instance, O'Dens is aware of past instances where employees issued pay-related ultimatums (O'Dens 38:15-40:3/Pl.'s App. 351-53), and Pou has received employee demands to discipline or fire co-workers.  (Pou 23:11-19/Def.'s App. 45)  Yet both claim surprise at the April 13 e-mail and argue that it was grounds for termination while offering nothing to distinguish Black from these earlier, unremarkable cases.  An apparent difference is that Black complained to them about her classification status, and it is reasonable to infer that the FLSA complaints led O'Dens and Pou to treat Black differently.

Moreover, the process used to reach the decision to terminate Black and the context in which that decision occurred cast doubt on SettlePou's explanation.  Black by all accounts was a good employee who, according to Pou, "follow[ed] the Core Values" and was "a valuable teammate."  (Pou 46:22-25, 47:14-48:5/Pl.'s App. 380-81; Williams 140:15-18/Pl.'s App. 413)  None of the decision-makers saw a need to discipline her before Williams handed Settle the April 13 e-mail.  (O'Dens 18:21-19:4/Def.'s App. 55)  Meanwhile, SettlePou's Progressive Discipline policy allows several forms of discipline short of termination.  (Williams 140:12-18/Pl.'s App. 413; Pl.'s App. 48)

Yet SettlePou contends that the April 13 e-mail was grounds for immediate termination, and O'Dens, Pou and Settle gave no consideration to progressive discipline.  (O'Dens 66:19-22/Pl.'s App. 366; Pou 35:10-17/Def.'s App. 48)  They decided on termination in *less than eight minutes* without seeking Black's side of the story or her reason behind the April 13 e-mail. (O'Dens 11:3-16/Def.'s App. 53; Pou 29:6-9/Def.'s App. 47)  O'Dens, Settle, and Pou acted without learning what "[had] transpired."  (Pou 24:8-20, 28:13-18/Def.'s App. 45-46; Settle 22:4-

---

[64] *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 (5th Cir. 1993).

[65] *James v. Career System Develop. Corp.*, No. C-05-4125, 2008 WL 3891968, * (N.D. Cal. Aug. 20 2008)(finding fact issues on retaliation where employer terminated complaining employee for non-compliance with the company's Core Values).

7/Def.'s App. 34)  To Pou, Black "didn't even define what she was talking about" in the e-mail. (Pou 27:1-17/Def.'s App. 46)  No one cared to discover this critical context.  The decision-makers now claim that, while Black had the authority to seek Shed's termination, it was not worth talking to her about the April 13 e-mail before dispatching her.  (O'Dens 12:20-22, 13:20-7/Def.'s App. 53-54; Settle 24:9-16/Def.'s App. 24)

Leaving aside Core Values like diligence, finding solutions, communication, and following through that were absent from the termination decision, the question is how O'Dens, Settle, and Pou could reach the conclusion they did so quickly and without critical information. Common sense suggests that, "from a business standpoint, it makes sense to try to utilize corrective action" and progressive discipline with problem employees.[66]  SettlePou's rush to judgment belies its concern for reinforcing the firm's Core Values.  Rather, it suggests that Black's fate was pre-determined by some other motive—such as silencing Black's FLSA complaints.  This is a question for jury.

The response to evidence of SettlePou's hasty decision-making may be that it emphasizes the seriousness of the situation and the firm's determination to enforce its Core Values.  But electing between competing interpretations of SettlePou's actions is for the jury and improper on summary judgment.

Williams's testimony further clouds the issue.  Williams testified that Black made a verbal ultimatum in the late afternoon of April 12 using language like that in the April 13 e-mail. (Williams 78:9-18, 81:2-11/Def.'s App. 73-74)  Rather than warn Black that the supposed ultimatum put her job at risk, however, Williams tried to talk through it with her.  (Williams 81:5-24, 82:23-83:11, 90:22-91:3/Def.'s App. 74, 76)  Though she claims surprise, Williams did not feel it necessary to share Black's comments with firm management or discipline Black.

---

[66] *See Laxton*, 333 F.3d at 582.

(Williams 82:15-22/Def.'s App. 74, 141:1-3/Pl.'s App. 414)   She did not think the so-called ultimatum was a terminable offense.   Critically, the head of SettlePou's Human Resources department simply did not think "[t]his is something she could get fired for[.]"  (Williams 82:23-83:11/Def.'s App. 74)   Now SettlePou argues that the written version of virtually the same comments was immediate grounds for discharge.

The Supreme Court's mandate for district courts on summary judgment "not to substitute [the court's] judgment for that of the jury and not unduly restrict a plaintiff's circumstantial case of discrimination" applies here.[67]   As in *Martin v. UT Southwestern Med. Ctr.*, this Court must assess whether SettlePou's reason for termination is of "such magnitude" that there is no factual question for the jury.   In *Martin*, echoing SettlePou's summary judgment brief, the employer argued that "[n]o reasonable jury would reject the assertion that Martin's regular tardiness and absences were not [*sic*] part of the reason her contract was cancelled."[68]  This Court rejected the defense's argument even with evidence that Martin was in fact tardy and/or absent on nine occasions, finding that the jury needed to determine whether this was evidence of a credible reason or whether it was pretext for retaliation.[69]

A jury must determine whether putting in writing what only the day before was a non-terminable offense was credible grounds for immediate termination of a five-year employee with no prior discipline issues after five-to-eight minutes of deliberation and no investigation.   It is a fact question whether the April 13 e-mail is "evidence […] of such magnitude that a reasonable jury could *only* find" in SettlePou's favor.[70]

---

[67] *Martin v. UT Southwestern Med. Ctr.*, No. 3:07-cv-1663, 2009 WL 77871, *14 (N.D. Tex. Jan. 12, 2009)(quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).
[68] *Id.*
[69] *Id.* at **12, 14.
[70] *Id.* (quoting *Laxton*, 333 F.3d at 585-86)(emphasis in original, internal citations omitted).

(iii)   *Inconsistencies in SettlePou's evidence story raise larger credibility issues that a jury must address*

SettlePou's varying reasons and its claimed reliance on a single e-mail as grounds for immediate termination are not the only inconsistencies and credibility questions in the record. Inconsistencies in an employer's evidence allow a jury to infer that the employer's reason for termination is unworthy of belief.[71]

The inconsistencies and credibility questions in SettlePou's statements are numerous.

| Original position | | Summary judgment position/contradictory evidence | |
|---|---|---|---|
| About who classified employees as exempt or non-exempt, SettlePou answered: *"Defendant's Management Committee with input from Director of Human Resources, Director of Administration, Division Heads, and Personnel Committee"* | Def.'s Rog Ans. (No. 6, 10)/Pl.'s App. 159-160, 174-175 | Personnel Committee made decision to classify Black as exempt; the Management Committee was not involved. | Settle 7:4-8:2, 19:14-17/Def.'s App. 30, 33; Pou 7:24-8:5/ Def.'s App. 42 |
| *Compare* O'Dens declaration: *"Classification of paralegals is examined, analyzed and assessed by division heads, in consultation, with the firm's Administrator and Director of Human Resources ...."* | O'Dens dec. ¶10 (Doc. 16). | Division heads have no role in classifying employees. | Williams 35:13-16/ Def.'s App. 66 |
| O'Dens, Settle, and Pou: Black supervised both Shed and Glenda Davis | Def.'s App. 36; Pl.'s App. 236-37; Pl.'s App. 368; *compare* Pl.'s App. 291-93; Pl.'s App. 2 | Arguing that Black's "admitted attempts to supervise Shed and [Keetra] McGee confirms SettlePou's testimony that she was supervising two or more employees."[72] | Def.'s Br. at 14 |
| *Compare* Davis: *"I don't feel that she, quote, "supervised me" at all...."* | | | |
| Settle and Pou claim that the Management Committee has never considered employee FLSA complaints: | Pl.'s App. 378, 383 | The Personnel Committee reported to the Management Committee in February 2010 about Black's "status" | See Sanford dec. Tab S/Pl.'s App. 426 |
| *Settle: "I don't know. Never came up before."* | Def.'s App. 36 | | |
| O'Dens and Settle contend that it was inappropriate for Black to take her concerns to HR rather than to Settle. | | Settle and Williams admit that, under the Open Door policy, Black was free to discuss with HR. | Pl.'s App. 391; Def.'s App. 75 |

---

[71] *Martin v. UT Southwestern Med. Ctr.*, No. 3:07-cv-1663-O, 2009 WL 77871, *13 (N.D. Tex. Jan. 12, 2009).

[72] The assertion that Black supervised both Shed and McGee is temporally impossible, at least so far as the FLSA contemplates supervision.   McGee left SettlePou three days before the firm hired Shed. (Sanford dec. Tab T/Pl.'s App. 430)

| | | | |
|---|---|---|---|
| Settle and Pou deny knowing about Black's misclassification inquiries or her failed attempts to supervise Shed:<br><br>Settle: *"I didn't even know about those discussions."* | Def.'s App. 44<br><br>Def.'s App. 39; *see also* Def.'s App. 35, 39 | Black discussed directly with Settle and Pou her OT complaint—one week before termination. | Black 62:11-64:22, 66:12-20/Def.'s App. 87-88 |
| SettlePou: Black's status changed to exempt when she "began supervising employees." | Def.'s Br. at 2 ¶ 4 | Williams and Morgan confirm that the "promotion" was to avoid overtime | Pl.'s App. 4; Pl.'s App. 73 |
| SettlePou:  Black never worked more than 40 hours in a week in 2007, 2008, 2009, or 2010. | Pl.'s App. 303 | O'Dens:  *"I'm sure there were times in 2010 when she worked more than 40 hours in a week...."*  And in 2007 and 2008: *"Probably, absolutely."* | Pl.'s App. 364-65 |

SettlePou is in a position to know *why* the firm terminated Black and *who* made the decision to classify her as exempt.  It should know whether anyone in the firm knew that she worked more than 40 hours each week, especially since Pou acknowledged that the firm was "keeping [Black] late so much" and "for such long hours."  (Black dec. ¶4/Pl.'s App. 72) Similarly, if the firm made Black exempt because she supervised two or more employees, one assumes that SettlePou could identify the two individuals.  Yet its brief and deposition testimony differ.  These inconsistent and false details raises larger credibility issues that only the jury can resolve.[73]

(iv)   *SettlePou's actions after deciding on termination contradict its claim that the April 13 e-mail was sufficient grounds for termination*

SettlePou's actions after the termination decision are further pretext evidence.   First, SettlePou offered Black severance.  (O'Dens 34:23-35:20/Pl.'s App. 349-50)  This is not the act of an employer who genuinely believes that an earnestly held company value was violated.  Rather, that SettlePou made the severance offer contingent on a release of Black's FLSA rights is evidence of willfulness.[74]   Second, SettlePou followed Black's so-called ultimatum—which it

---

[73] *Reeves*, 530 U.S. at 150-51.

[74]  *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 482 (5th Cir. 2007)(stating that the employer's unsuccessful efforts to obtain the employee's release of his ADEA claims "tended to show that [the employer's] knowingly violated the ADEA or recklessly disregarded whether its conduct toward [the

claims violated the Core Values of "engaging others with humility," finding solutions," and "communication"—*with its own ultimatum.*  In contrast to Black's offer to discuss the issue upon her return, the firm offered Black the stark choice of resigning with severance and a release *or* termination.[75]  (Black 138:21-141:7/Def.'s App. 96-97; Sanford dec. Tab S/Pl.'s App. 420)

(v)     *The suspicious timing of Black's termination—within weeks of her overtime complaints—and admissions by SettlePou personnel of overtime avoidance is further evidence of pretext*

Finally, evidence of pretext is in the close timing of Black's FLSA complaints and the termination decision, and the other evidence in her *prima facie* case.  The jury may consider this evidence and properly draw any inferences from it in examining SettlePou's story.[76]

Viewed in Black's, the evidence is that O'Dens, Settle, and Pou decided to fire Black on April 13 in a five-to-eight minute discussion.  (O'Dens 10:17-11:8/Def.'s App. 53)  No one spoke to Black about the April 13 e-mail or tried learn "everything that [had] transpired."  The haste of the decision fits in with the suspicious timing.  O'Dens recommended termination one month after the Personnel Committee took up Black's "request" to be reclassified.  (Pl.'s App. 346-48; Def.'s App. 69)  Settle and Pou agreed to termination just *one week* after Black addressed her misclassification complaints to them directly.  (Black 62:7-14, 64:5-66:23/Def.'s App. 87-88)  Their awareness of Black's FLSA complaints and swift actions so close after the complaints—especially in light of other pretext evidence—casts doubt on their true motives and leaves a fact question for the jury.

Ultimately, Black's pretext evidence, together with her *prima facie* case, allows the jury

---

employee] was prohibited by the statute.").

[75]  *See* MERRIAM-WEBSTER DICTIONARY (ultimatum: "a final proposition, condition, or demand; *especially*: one whose rejection will end negotiations and cause a resort to force or other direct action")(available at http://www.merriam-webster.com, last visited on August 26, 2011).

[76]  *Laxton*, 333 F.3d at 582 (citing *Reeves*, 530 U.S. at 143).

to infer that SettlePou retaliated against her.[77]  Indeed, the combination of this evidence "is likely to support an inference of [retaliation] even without further evidence of [SettlePou's] true motive."[78]  For, "once the employer's justification has been eliminated, [retaliation] may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."[79]

**3.    Genuine issues of fact remain in dispute as to whether SettlePou willfully misclassified Black under the FLSA**

The FLSA provides a three-year statute of limitations for willful violations.[80]  SettlePou acted willfully if it knew that its pay policies violated the FLSA *or* showed reckless disregard for the statute.[81]  Willfulness is a different concept than "good faith," which SettlePou must show to avoid liquidated damages, but a finding of willfulness precludes a finding of good faith.[82]

SettlePou's defense to a finding of willfulness is that it was merely negligent in misclassifying Black.  (Def.'s Br. at 14)  This argument, however, overlooks evidence that SettlePou deliberately misclassified Black to avoid overtime payments.  Williams and Morgan admitted as much.[83]  Both confirmed that that the "promotion" was so that the firm did not have to pay her overtime.  (Pl.'s App. 63-65; Black dec. ¶8/Pl.'s App. 4)  The Court's February 14, 2011 order noted that there "seem[ed] to be no explanation as to why some paralegals were classified 'exempt' and others were not" other than the opinion of supervisors (*e.g.*, Morgan) and

---

[77] *Laxton*, 333 F.3d at 578.

[78] *Id.*

[79] *Reeves*, 530 U.S. at 147.

[80] 29 U.S.C. § 255(a).

[81] *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2003)(citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

[82] *Perez v. Guardian Equity Mgmt., LLC, et al.*, No. H-10-0196, 2011 WL 2672431, *9 (S.D. Tex. Jul. 7, 2011).  The record lacks the objective and subjective good faith necessary for SettlePou to avoid liquidated damages.  Given the weight of DOL interpretation letters against SettlePou's classification decisions, it was unreasonable for any employer—much less a law firm capable of researching the FLSA—to treat Black as exempt.  Meanwhile, Morgan's and Williams's admissions show SettlePou's subjective bad faith.  (Black dec. ¶8/Pl.'s App. 4; Pl.'s App. 63-64).

[83] Williams's and Morgan's statements were not hearsay since both were agents of SettlePou acting within the scope of their authority.  *See* FED. R. EVID. 801(d)(2).

the Director of Human Resources (*i.e.*, Williams).   In these admissions lies the answer to the Court's comment.

SettlePou's awareness of Black's misclassification explains its inaction in the face of her complaints.   Black first raised her concerns within a week of the "promotion", and then consistently raised the issue over the next three years.   Nonetheless, there is no evidence that SettlePou did anything until Black's complaints prompted the Personnel Committee to examine her status in February and March 2010.   (O'Dens 55:10-58:13, 96:18-21/Pl.'s App. 360-63, 370; Pou 42:13-20/Pl.'s App. 239; Settle 6:25-8:2/Def.'s App. 30)   More than three years passed before SettlePou addressed Black's objections; meanwhile, SettlePou knowingly received the benefit of more than 200 hours of overtime at no extra cost.   (Def. App. 26; Black dec. ¶4/Pl.'s App. 72)   The firm's unexplained inaction in the face of clear warnings distinguishes this case from *Valcho v. Dallas Co. Hosp. District*, where the plaintiff supplied no evidence that the hospital knew it was violating the law and where the plaintiff never "complained *or questioned* the fact that she was classified as an exempt" employee who did not receive overtime.[84]

Further, when SettlePou at last acted on Black's complaints, its review was cursory and considered only one element (*i.e.*, supervision) of one exemption (*i.e.*, executive).   The Personnel Committee in early February and again in early March reexamined Black's exempt classification "based on" her February 10 e-mail and "request by Ms. Black to change her status."   (O'Dens 21:17-23/Def.'s App. 56, 31:2-9/Pl.'s App. 348)   O'Dens describes the committee's evaluation as focused solely on Black's alleged supervision:   "Questions were asked whether or not she was continuing to supervise two or more people.   The answer was that she was, and based on her

---

[84] *Valcho v. Dallas Co. Hospital Dist.*, 658 F. Supp. 2d 802, 809-10 (N.D. Tex. Aug. 14, 2009); *compare Monroe Firefighters Assoc. v. City of Monroe*, No. 06-cv-1092, 2009 WL 916272, *8 (W.D. La. Mar. 31, 2009)(finding fact issues on willfulness precluded summary judgment where the city continued to misclassify firefighters for nearly two years after receiving a letter from counsel highlighting the misclassification).

supervising two or more people, it wasn't necessary to – to change her status…." (O'Dens 22:6-12/Def.'s App. 56)

O'Dens admits that the committee discussed "Black's request that she be changed to non-exempt," though he curiously distinguishes this from "a request under the FLSA." (*Id.*) Not discussed however, were the DOL's regulations and Black's actual duties. (O'Dens 29:5-20/Pl.'s App. 347; Williams 49:11-20, 51:11-21, 53:4-9/Def.'s App. 69-70)

The executive exemption requires four elements.[85] To qualify, the employee must earn a sufficient salary, have as her primary duty management of customarily recognize subunit, "customarily and regularly" supervise at least two employees, and have authority to hire and fire (or have "particular weight" given to her recommendations on those subjects). The regulations go on to define "management," "primary duty," "customary and regularly," and "particular weight".[86] Each factor must be present to exempt the employee.[87]

There is no evidence that the Personnel Committee considered the three other factors before deciding not to change Black's status. SettlePou admits that Black did not have authority to hire and fire other employees, but did the Personnel Committee (or anyone at SettlePou) consider whether her suggestions or recommendations received "particular weight"? No. Did anyone determine whether the shared supervision of Shed met the requirement to supervise two or more employees? No. Was Black's "primary duty" or the amount of time that Black spent performing "exempt" work examined? No. Was there even any consideration given to whether Black, as opposed to Settle or Don Gwin, the head of the Commercial Lending group (Sanford dec. Tab T/Pl.'s App. 432; *see also* Williams 41:16-21/Def.'s App. 68), even managed "a customarily recognized department or subdivision"—much less had it as her "primary duty".

---

[85] 29 C.F.R. § 541.100.

[86] 29 C.F.R. § 541.102 ("management"); 29 C.F.R. § 541.700 ("primary duty"); 29 C.F.R. § 541.701 ("customarily and regularly"); 29 C.F.R. § 541.105 ("particular weight").

[87] *Id.* (using the conjunctive "and").

No.  Instead, the committee of three lawyers and the firm's leading HR person self-servingly concluded that Black was exempt because she supervised not only Shed but also Davis, who now denies that fact.  SettlePou was reckless in failing to ask these questions while wrongly viewing Black as Davis's supervisor when they knew that she did not even share supervision of Davis.

Tellingly, SettlePou's brief still fails to identify *two* employees whom Black supervised simultaneously.  O'Dens and Settle at first claimed that Black supervised both Shed and Glenda Davis.  (O'Dens 58:14-22 ("Q. Anyone else? A. Not that I'm aware of.")/Pl.'s App. 363; Settle 9:13-16/Def.'s App. 31)  But Davis, who admits hostility toward Black's claims, unequivocally denied that Black ever supervised her.  (Davis 14:11-19, 35:20-36:6, 37:6-8/Pl.'s App. 291-93; *see also* Weber ¶8/Pl.'s App. 316)  While Davis believes that Black supervised Shed, she did not "feel that [Black], quote, "supervised [her] at all…."  (*Id.*)  SettlePou's brief pivots with a contention that Shed and Keetra McGee were the two supposedly under Black's supervision (Def.'s Br. at 14), failing to note that Shed succeeded McGee in the job.  (Pl.'s App. 430) Moreover, as explained in Plaintiff's motion, shared supervision only counts as fractions of a person for purposes of the executive exemption. [88] (Pl.'s Br. at 21 (Doc. 35))

There is a suggestion that SettlePou, through the Personnel Committee, "periodically evaluates the exemption status of its paralegals" (Def.'s Br. at 13), but where is the evidence? True, the Personnel Committee examined one aspect (supervision) of one exemption (executive) as it related to Black in early 2010, but O'Dens admits that Black prompted this review. (O'Dens 21:17-23/Def.'s App. 56; *see also* Williams 36:16-18/Def.'s App. 66)  As for other employees, Williams, a member of that committee, was able to pinpoint only two other instances of the Personnel Committee evaluating paralegal exemption status.  (Williams 153:1-23/Pl.'s App. 415)  These cases followed the Personnel Committee's consideration of Black's status.

---

[88] 29 C.F.R. § 541.104.

(Williams 36:9-18 ("Betty's request" was the "first time that [she] recall[s] it coming up")/Def.'s App. 66)   In each case, SettlePou reclassified the paralegals (Beth Greenwood and Deborah Offenhouser) so that they would begin receiving overtime.   Williams, however, cannot recall when those changes occurred, though she recalls no instances of the firm reclassifying employees *before* Black's termination.   (*Id.*)   The reasonable inference to which Black is entitled is that SettlePou reclassified Greenwood and Offenhouser only *after* Black's termination, the April 23 e-mail from Lenhardt expressly stating that SettlePou misclassified its employees, and this lawsuit.

SettlePou's reclassification of the two other paralegals after Black's termination fits in the pattern of misclassifying employees based on supposed supervision.   Like Black, SettlePou "promoted" Vasquez to paralegal when she supposedly "began to supervise at least two employees" and thereafter treated her as exempt.   (O'Dens 78:11-16/Pl.'s App. 369; Vasquez dec. ¶5/Pl.'s App. 309)   Also like Black, Vasquez had no actual supervisory authority and never supervised anyone in ways recognized by the FLSA regulations.   (*Id.* ¶9; *see also* Weber ¶7/Pl.'s App. 315)   Similarly, of the firm's two IT employees, one is classified as exempt because, according to Director of Administration Turner, the IT employee "was supervising the non-exempt employee and was directing that employee's work."   (Turner 33:18-24/Pl.'s App. 399)   Turner's use of the singular highlights SettlePou's willful misunderstanding and abuse of the executive exemption.

The wide availability of useful guidance brings SettlePou's recklessness into further relief.   Williams admits that she did not so much as do a "Google search" regarding paralegal classification.   (Williams 54:8-11/Def.'s App. 70)   O'Dens, for his part, did not review the regulations until mid-*2011*—more than a year after Black's firing and this lawsuit.   (O'Dens 55:20-57:18/Pl.'s App. 360-62)   By comparison, Black and Glenda Davis—both non-attorneys—

were able to locate information bearing on paralegal classification and supervision through basic internet searches.  (Black 98:23-99:11 ("I looked it up…. I think you're wrong and you should check into it.")/Def.'s App. 94; Davis 35:20-36:17/Pl.'s App. 291-92)   Had anyone from SettlePou "check[ed] into it," a simple internet search would have revealed several resources indicating that paralegals generally are not exempt employees.  (Sanford dec. ¶9/Pl.'s App. 319, 442)  Likewise, the DOL's public website offers access to Wage and Hour Division interpretation letters such as the seven letters since 1994 reaffirming the DOL's long-standing position that paralegals do not meet the tests for the administrative and learned professional exemptions.  (*See supra* nn. 3-4)

Given this plain guidance, SettlePou cannot plead ignorance.  Partners like Pou, Settle, and O'Dens did little to educate themselves about the FLSA's requirements or ensure compliance during Black's employment.  Williams, head of Human Resources and part of the Personnel Committee, was no better informed.  One would expect Human Resources to monitor the firm's compensation practices to ensure statutory compliance, but Williams admits that she undertook no training on the FLSA and has no understanding of the FLSA's regulations addressing exemptions.  (Williams 26:3-27:18, 53:17-54:11/Def.'s App. 70, 139:1-12/Pl.'s App. 413)  And the firm offered no employee training on the FLSA and its protections and obligations.  (Turner 38-39/Pl.'s App. 398-99; Weber dec. ¶9/Pl.'s App. 316)  Meanwhile, O'Dens testified that Black "absolutely" worked more than 40 hours in a week for several years.  (O'Den 60:2-9/Pl.'s App. 365)  Yet he did nothing to ensure that the firm paid her properly.  This indifferent, hands-off approach to FLSA compliance becomes reckless disregard when Black's repeated objections are taken into account.

In the end, it is a fact issue whether a firm of 30 lawyers recklessly disregarded the FLSA when it took no action to confirm Black's status over the course of three years of her raising the

issue and, when it finally looked into the issue, misapplied the exemption in the face of repeated guidance by the DOL contradicting its conclusion.  Viewing this evidence in Black's favor shows that SettlPou's willfulness remains very much in dispute.

4.     **Application of the fluctuating workweek is improper here, where the parties lacked a clear, mutual understanding and where SettlePou paid *no* overtime, and Black is entitled to judgment as a matter of law**

The summary judgment evidence is that SettlePou willfully misclassified Black for three years and reaped the benefit of several hundred hours of undercompensated labor.  It now attempts to avoid the full extent of that liability through a retroactive application of a narrow exception to the FLSA's overtime requirements called the fluctuating workweek (FWW). SettlePou asks the Court to forgive more than two-thirds of the harm Black suffered by imposing an agreement between SettlePou and Black that her overtime would be compensated at half-time where there plainly was no such agreement.

SettlePou, suggesting that the FWW applies anywhere an employee is paid a fixed salary, misunderstands the rule.  (Def.'s Br. at 15)  The FLSA mandates that employers compensate employees at one-and-a-half times their regular rate of pay for each hour worked beyond 40 in a workweek.[89]  The Supreme Court instructs that the FLSA's protections should not be interpreted in a grudging or narrow manner.[90]  Thus, exceptions and exemptions are to be construed narrowly against the employer.[91]

SettlePou argues that the FWW applies because it "is undisputed that Plaintiff was paid a fixed salary."  (Def.'s Br. at 15)  In 1968, the DOL issued an interpretive bulletin to address the payment of overtime to salaried employees "who do not customarily work a regular schedule of

---

[89] 29 U.S.C. § 207(a)(1).
[90] *Tenn. Coal, Iron & R. Co. v. Muscola Local No. 123*, 321 U.S. 590, 597 (1944).
[91] *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 153 (5th Cir. 1982).

hours."[92]   The bulletin reflected the DOL's interpretation of two earlier Supreme Court cases, *Overnight Motor Transport Co. v. Missel*, 316 U.S. 572 (1942), and *Walling v. A.H. Belo Corp.*, 316 U.S. 624 (1942), that addressed payment of overtime to employees whose schedule fluctuated from week to week but who contracted for a predictable, flat rate of pay.[93]   Notably, neither Supreme Court case concerned misclassified workers but rather non-exempt employees who had contracted for a fixed salary.[94]   The DOL's interpretation, found at 29 C.F.R. § 778.114, was meant to resolve confusion lingering after *Overnight Motor* and *Walling*.[95]

The DOL bulletin imposes five requirements before an employer may use the FWW method to pay a non-exempt employee half-time rather than the general one-and-a-half-time premium.[96]   To benefit from this exception from the general 1.5-times requirement, the employer must show (1) "a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number…," (2) varying hours worked week to week, (3) payment of a fixed salary, (4) that the salary exceeds the minimum wage, and (5) that the employee "receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay."[97]   An employer that does not satisfy these "legal prerequisites" cannot use FWW

---

[92] 29 C.F.R. § 778.114(c).   For the history of the fluctuating workweek and the DOL's interpretive bulletin, see *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 55-58 (D.D.C. 2006).

[93] *In re: Tex. EZPawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 399 (W.D. Tex. 2008).

[94] *Id.*

[95] The interpretative bulletin does not have the force of law.   *See Russell v. Wells Fargo and Co., et al.*, 672 F. Supp. 2d 1008, 1011 n.1 (N.D. Cal. 2009).   Though a source of guidance, the amount of deference to be paid to 29 C.F.R. § 778.114 depends on factors such as "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."   *Tex. EZPawn* (quoting *U.S. v. Mead Corp.*, 533 U.S. 218, 228 (internal punctuation omitted)).

[96] *Tex. EZPawn*, 633 F. Supp. 2d at 400.

[97] *Id.*; *Rainey v. Am. Forest and Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 100 (D.D.C. 1998); *see also Conne v. Speedee Cash of Miss.*, 246 Fed. Appx. 849, 851 (5th Cir. Jul. 23, 2007)(noting requirement that employee receive additional compensation for overtime before FWW applies); *Russell*, 672 F. Supp. 2d at 1012 (same).

method to compensate employees for overtime at one-half the fluctuating regular rate.[98]

The FWW rule is unavailable in this misclassification case because SettlePou is unable to establish two prerequisites. Evidence of a "clear mutual understanding" and contemporaneous payment of overtime at half-time is lacking. Further, 29 C.F.R. § 778.114(a), on which the Fifth Circuit relied in *Blackmon v. Brookshire Grocery Co.*,[99] is by its plain language *prospective* and therefore an improper basis for retrospective relief.[100]

Black earlier moved for summary judgment in her favor on this issue, and she incorporates the arguments and evidence in her motion. Because SettlePou cannot establish the prerequisites for the FWW method, the issue is no longer genuinely disputed. Black is therefore entitled to judgment as a matter of law that SettlePou is liable to her at 1.5 times her regular rate for all overtime hours if the Court or jury determines that SettlePou misclassified Black.

**(a)   *The FWW is unavailable where there was no "clear mutual understanding" and where SettlePou failed to pay any overtime, even at a half-time rate***

SettlePou must satisfy the "legal prerequisites" to benefit from the FWW. Its argument rests on a supposed tacit agreement by Black to accept the FWW. (Def.'s Br. at 15) But the facts do not reflect or even imply an agreement on two of the FWW's prerequisites. As the Supreme Court noted in *Overnight Motor*, "[i]mplication cannot mend a contract so deficient in complying with the law."[101]

SettlePou is not entitled to use the FWW calculation to reduce its liability because there was no "clear mutual understanding." There was no agreement that Black's salary was

---

[98] *Russell*, 672 F. Supp. 2d at 1012.

[99] 835 F.2d 1135, 1138 (5th Cir. 1988).

[100] 29 C.F.R §778.114 (noting that FWW is lawful only "if [the employee] *receives* extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay"; *see also Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001)(describing the FWW method as a *compliance* measure rather than a remedial scheme); *Tex. EZPawn*, 633 F. Supp. 2d at 404-05.

[101] *Overnight Motor*, 316 U.S. at 581.

"compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number…" and SettlePou failed to pay overtime at the required ½-time premium.[102]

(i)     *Was there a clear mutual understanding where SettlePou treated Black as ineligible for overtime and Black continuously objected to the lack of overtime?  No.*

Citing no evidence, SettlePou argues that "Plaintiff understood that she earned the same salary each pay period regardless of the number of hours she worked as an exempt paralegal." (Def.'s Br. at 15)  The facts say otherwise.

- There was no discussion with Black about a fluctuating workweek or overtime payments when SettlePou "promoted" her to exempt paralegal.  (Black dec. ¶¶5, 8-9/Pl.'s App. 3-4)

- Williams, who communicated the "promotion" to Black, is unaware of any fluctuating workweek agreement (Williams 121:1-16/Pl.'s App. 412);

- SettlePou never paid Black after the "promotion" for overtime and, indeed, SettlePou has always contended that Black was ineligible (Pl.'s App. 303).  The handbook confirms SettlePou's understanding that Black would not receive overtime (Pl.'s App. 30-31);

- SettlePou denies that Black ever worked more than 40 hours in a week and therefore cannot claim that Black worked or would work a fluctuating schedule (Pl.'s App. 303);

- Black objected repeatedly to the lack of overtime pay and therefore lacked an understanding that overtime hours were being compensated or that she would receive a half-time overtime premium (*see supra* at 7-13);

- SettlePou uniformly pays its "non-exempt" employees at 1.5 times the regular rate (Williams 119:4-12, 121:17-122:1/Pl.'s App. 411-12; Black dec. ¶5/Pl.'s App. 3; Vasquez dec. ¶¶4-5/Pl.'s App. 308-09); Davis 17:19-19:8/Pl.'s App. 342); Weber ¶3/Pl.'s App. 313;

- SettlePou's basic workweek is fixed at 37.5 hours and its policy is that employee salaries cover this 37.5-hour week (Pl.'s App. 30); Weber ¶4/Pl.'s App. 313).  Indeed, Williams advised paralegals to enter block time totaling 37.5 hours per week rather than to track actual hours worked (Williams 73:4-9/Def.'s App. 72; Vasquez dec. ¶6/Pl.'s App. 309;

- SettlePou's policy is to deduct pay if an employee exhausts available leave. (Williams 155:9-19/Pl.'s App. 415; Black dec. ¶11/Pl.'s App. 5; Weber dec. ¶4/Pl.'s App. 313)  As Davis explained, she "didn't work 20 hours and then expect [SettlePou] to pay [her a] full salary." (Davis 17:19-19:8/Pl.'s App. 342);

- SettlePou's payroll system is set up to pay employees at 1.5 times for overtime (Williams 121:17-122:1 ("That's the way it's set up in the Paychex system.")/Pl.'s App. 412; and

---

[102] *Hunter*, 453 F. Supp. 2d at 58; *Russell*, 672 F. Supp. 2d at 1012; *Tex. EZPawn*, 633 F. Supp. 2d at 400.

- SettlePou now pays Beth Greewood and Peggy Offenshouser, reclassified after Black's termination, at time-and-a-half.  (Williams 153:10-154:2/Pl.'s App. 415)

Williams—*in this case*—calculated Black's overtime loss using a 1.5-time premium.  (Williams 118:2-121:16/Pl.'s App. 411; Ex. 33/Pl.'s App. 185)   She reviewed SettlePou's sporadic to calculate Black's hours from 2007 to 2010 to come reach an overtime estimate.  (*Id.*)  She then multiplied the number of overtime hours by a *1.5-time* premium to reach a dollar figure.  (*Id.*)  Meanwhile, the firm's top HR official, is unaware of any fluctuating workweek agreement.  (*Id.* at 121:1-16/Pl.'s App. 412)

Williams's lack of awareness fits with SettlePou's silence on the issue until last month.  The firm said nothing about a FWW agreement during Black's employment and for a full year into this lawsuit.  Because SettlePou first raised the FWW on July 29, 2011, through its counsel's objection in Williams's deposition, Black's counsel was unable to question O'Dens, Turner, Pou, and Settle about their knowledge of an alleged agreement.   Even so, SettlePou presents no testimony from these or any other witnesses substantiating an alleged FWW agreement.   Their silence is telling.

The lack of understanding between Black and the firm that her salary covered fluctuating hours distinguish this case from SettlePou's citations.   In *Donihoo v. Dallas Airmotive, Inc.*, for example, the plaintiff admitted that, "he realized Dallas Airmotive intended for his salary to cover all of his hours worked."[103]   Likewise, in *Tolentino v. C&J Spec-Rent Serv., Inc.*, admitted that they received fixed salaries, that their schedules varied, and that they understood they would not receive overtime.[104] Even in *Blackmon*, where the Fifth Circuit applied 29 C.F.R. §778.114

---

[103] *Donihoo v. Dallas Airomotive, Inc.*, No. 3:97-cv-0109P, 1998 WL 47632, *6 (N.D. Tex. Feb. 2, 1998).
[104] *Tolentino, et al. v. C&J Spec-Rent Serv. Inc.*, C-09-326, 2010 WO 2735719, *3 n.3 (S.D. Tex. Jul. 12, 2010).

without analysis,[105] the plaintiffs received promotions with the "understanding that they would be paid a fixed salary" and each "was aware that the fixed weekly compensation would not fluctuate with the hours worked."[106]  Thus, there was no dispute in *Blackmon* of a "clear mutual understanding" about the fluctuating workweek.

This case presents a contrasting scenario.   Black believed from day one that the "promotion" to exempt paralegal was "so that the firm d[id]n't have to pay [her] overtime." (Black 44:3-46:23/Def.'s App. 84-85)  She objected to her classification as exempt within a week of the "promotion," telling Williams, "I don't think it's right."  (Black dec. ¶8/Pl.'s App. 4; Pl.'s App. 64)  Plainly, Black disagreed with the manner in which SettlePou was attempting to pay her.  Moreover, SettlePou cannot dispute that Black relied on the employee handbook's statement that the firm's "standard workweek" was "8:30 a.m. – 5:00 p.m., Monday through Friday"—that is, 37.5 hours.  (Black dec. ¶11/Pl.'s App. 5; Pl.'s App. 30)  She believed that her salary covered only that workweek and therefore asked repeatedly to be paid overtime.  Consequently, there was no meeting of the mind—no "clear mutual understanding."

SettlePou also ignores a crucial fact that disqualifies its use of the FWW calculation. Williams testified that SettlePou's policy is to deduct pay when employees like Black exhaust available leave time.  (Williams 155:5-155:19/Pl.'s App. 415; Black dec. ¶11/Pl.'s App. 5)  This policy is fundamentally at odds with a fluctuating workweek agreement designed to compensate employees at fixed salary for "as many" or "as few" hours worked in a week.  The DOL's long-held view is that employers wishing to use the FWW method cannot deduct from the employee's salary absences occasioned employee.[107]

SettlePou, in asking for a FWW calculation, suggests that there was a "clear mutual

[105] *Tex. EZPawn*, 633 F. Supp. 2d at 406.

[106] *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1137 (5th Cir. 1988).

[107] *See Hunter*, 453 F. Supp. 2d at 61; *Garcia v. Allsup's Conven. Stores, Inc.*, 167 F. Supp. 2d 1308, 1312 (D.N.M. 2001)(citing *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 638 (5th Cir. 2001).

understanding" with Black that her salary covered more than 37.5 hours per week and that the overtime premium would be no more than one-half time.  In short, it asks the Court to find an agreement of which its Human Resource Director is unaware (Williams 121:1-16/Pl.'s App. 412) for something that the firm never discussed with Black, even when it reclassified her, that it never applied during her employment, that she objected to consistently for three years, that it asked of no other employee, and that today it does not apply to recently reclassified employees. These overwhelming facts weigh against SettlePou's claim to the FWW and, indeed, establish that Black is entitled to summary judgment on this issue.

(ii)     *Can SettlePou show contemporaneous overtime payments at half-time where it classified Black as exempt and refused to pay her overtime?  No.*

Contemporaneous payment of overtime is an essential prerequisite.[108]  The DOL explains that the FWW is not available "where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for non-overtime hours…."[109] SettlePou does not contest that it paid Black no overtime premium after the February 2007 "promotion".  (Def.'s Br. at 15; Pl.'s App. 303)  Thus, SettlePou cannot satisfy another legal prerequisite to 29 C.F.R. §778.114.

## CONCLUSION

Wherefore, for the above and foregoing reasons, Plaintiff respectfully requests that SettlePou's motion for partial summary judgment be denied in its entirety.

---

[108] *See Conne*, Fed. Appx. At 851; *Rainey*, 26 F. Supp. 2d at 100-01; *Scott v. OTS Inc.*, No. 1:02-cv-1950-AJB, 2006 WL 870369, *13 (N.D. Ga. 2006); *Cowan v. Treetop Enterprises*, 163 F. Supp. 2d 930, 941 (M.D. Tenn. 2001); *Monahan, et al. v. Emerald Perform. Materials, LLC*, 705 F. Supp. 2d 1206, 1215-16 (W.D. Wa. 2010).
[109] 29 C.F.R. § 778.114(c).

Date:   August <u>29</u>, 2011                    Respectfully submitted,

                                                Gillespie, Rozen & Watsky, P.C.
                                                3402 Oak Grove Ave., Suite 200
                                                Dallas, Texas 75204
                                                Tel:    214.720.2009
                                                Fax:    214.720.2291

                                                By:   */s/ Joseph H. Gillespie*
                                                      Joseph H. Gillespie
                                                      *Attorney-in-charge*
                                                      Texas Bar No. 24036636
                                                      josephgillespie@grwlawfirm.com
                                                      James D. Sanford
                                                      Texas Bar No. 24051289
                                                      jsanford@grwlawfirm.com

                                                **ATTORNEYS FOR PLAINTIFF
                                                BETTY BLACK**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August <u>29</u>, 2011 he electronically submitted the foregoing document to the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.  The electronic case files system sent a "Notice of Electronic Filing" to the following individuals, who have consented in writing to accept this Notice as service of this document by electronic means: Keith A. Clouse, Esq., and Emily M. Stout, Esq., of CLOUSE DUNN LLP.

                                                 */s/ James D. Sanford*
                                                One of Plaintiff's Counsel